ATC Realty v. Town of Kingston, NH    CV-00-535-JM  11/08/01  P

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


ATC Realty, LLC and SBA Towers, Inc.

   v.

Civil No. 00-535-JM
Opinion No. 2001 DNH 205

Town of Kingston, New Hampshire


**O R D E R**

    Plaintiffs ATC Realty, LLC and SBA Towers, Inc. (collectively, "SBA/ATC") seek an order directing the Town of Kingston, New Hampshire ("Kingston" or "Town") to issue SBA/ATC all permits and approvals necessary for the construction of 180-foot wireless telecommunications tower on property owned by Heidi J. Heffernan and located at 19 Marshall Road in Kingston (the "Heffernan Site").  SBA/ATC filed the present action after the Kingston Planning Board denied their application for a conditional use permit to construct the tower on the Heffernan Site, but granted a conditional use permit to American Tower Corporation ("American Tower"), the plaintiffs' competitor, to construct a 180-foot wireless telecommunications tower at an alternative location.  SBA/ATC allege that the Planning Board decision violated Section 704 of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c)(7)(B)(iii), because it was not

supported by substantial evidence contained in a written record. SBA/ATC further assert that the Planning Board's decision to deny their application had the effect of prohibiting the provision of wireless services in violation of Section 704 of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II). In addition, SBA/ATC contend that the Planning Board's decision violated New Hampshire law.

Before me is the plaintiffs' motion for summary judgment on each of their claims (document no. 11). Also before me is defendant Kingston's cross-motion for summary judgment as to all claims (document no. 9).

## Background

The following facts are undisputed. Plaintiffs SBA/ATC develop wireless telecommunications towers on behalf of a number of personal wireless service providers, including Nextel Communications, Sprint Spectrum PCS, Omnipoint Communications, AT&T Wireless, United States Cellular and Star Cellular ("providers"). Each of these providers holds a license from the federal government that allows the provider to offer wireless services within a certain market, and requires the provider to furnish those services to customers within that market. In order to meet their service obligations, the providers must deploy an

antenna network throughout the targeted geographic area. Generally, telecommunications towers like the towers constructed by SBA/ATC are capable of supporting antennas from several competing providers of wireless services.[1] The extent of the coverage afforded by each antenna on a tower depends upon a variety of factors, including the location of the antenna on the tower, the terrain and the existence of natural or man-made barriers that may block signals or cause interference.

The Route 125 Service Gap

Each of the providers that SBA/ATC support has a significant service gap in the northern section of Kingston. The gap encompasses a portion of Route 125, a major commuter thoroughfare. A multi-carrier tower known as the Crown tower provides service to the south of the gap, and a multi-carrier tower located in the neighboring town of Brentwood, New Hampshire provides service to the north of the gap. In order to close the gap, the providers must install antenna facilities at one or more locations between the Crown tower and the Brentwood tower.

Kingston's Telecommunications Facility Ordinance

Anyone wishing to construct a telecommunications tower

---

[1]The installation of multiple antennas on one tower is known as "co-location."

within the Town of Kingston must obtain prior approval from the Kingston Planning Board pursuant to Kingston's Telecommunications Facility Ordinance.[2] Pursuant to the Ordinance, new tower construction is permitted only within areas that are zoned "rural residential" and only after the applicant has obtained a conditional use permit from the Planning Board. The Ordinance requires each applicant for a conditional use permit to submit certain information to the Planning Board. Where the applicant is proposing to construct a new tower, the information must include, *inter alia*, evidence demonstrating that no existing structure can accommodate the proposed antenna and an agreement

---

[2]The stated purpose and goals of the Telecommunications Facility Ordinance include: (A) to preserve Kingston's authority to regulate and to provide for reasonable opportunity for the siting of telecommunications facilities by enhancing the service providers' ability to provide services quickly, effectively and efficiently; (B) to reduce potential adverse impacts from telecommunications facilities, including impacts on aesthetics, environmentally sensitive areas, historically significant locations, flight corridors, health and safety, and prosperity through protection of property values; (C) to provide for co-location and minimal-impact siting options; (D) to permit the construction of new towers only where all other reasonable opportunities have been exhausted; (E) to require cooperation and co-location, to the highest extent possible, between competitors in order to reduce cumulative negative impacts upon Kingston; (F) to provide constant maintenance and safety inspections for facilities; (G) to provide for the removal of abandoned towers; and (H) to provide for the removal or upgrade of technologically outdated facilities.

with the Town that "allows for the maximum allowance of co-location upon the new structure." In evaluating an application for a conditional use permit, the Kingston Planning Board considers the following factors:

a. The height of the proposed tower or other structure.

b. The proximity of the tower to residential development or zones.

c. The nature of uses on adjacent and nearby properties.

d. Surrounding topography.

e. Surrounding tree coverage and foliage.

f. The design of the tower, with particular reference to design characteristics that have the effect of reducing or eliminating visual obtrusiveness.

g. The proposed ingress and egress to the site.

h. The availability of suitable existing towers and other structures.

i. Visual impacts on viewsheds, ridgelines, and other impacts by means of tower location, tree and foliage clearing and placement of incidental structures.

j. The availability of alternative tower structures and alternative siting locations.

After consideration of these factors, the Planning Board may approve, approve with conditions or deny the application.

Plaintiffs' Application for a Conditional Use Permit

On May 18, 2000, SBA/ATC submitted an application to the Kingston Planning Board for the installation of "an unlighted 180 foot free standing multi-user telecommunication tower along with related ground equipment" at the Heffernan Site. The Heffernan Site consists of seventeen acres, is surrounded by woods, and is located in the northern section of Kingston, to the north of the Crown tower and to the south of the Brentwood tower. Although all except one of the abutting properties are residential, the Site includes several commercial operations, including a tack shop, a stained glass business, and a sawdust resale business. Because the Heffernan Site lies within a rural residential zoning district, SBA/ATC required a conditional use permit from the Planning Board.

American Tower's Application for a Conditional Use Permit

Two months after SBA/ATC submitted their application to construct a tower in Kingston, American Tower, a direct competitor of SBA/ATC, submitted an application to the Planning Board to construct a "180 foot wireless telecommunications tower plus equipment compound" on a thirty acre parcel of land owned by Northland Forest Products and located on Depot Road in Kingston

6

("Northland Forest Site").[3] The Site lies to the south of the

Heffernan Site and to the north of the Crown tower facility. It

contains a large lumber operation, is surrounded by trees, and

abuts properties that are used for residential and commercial

purposes. Like the Heffernan Site, the Northland Forest Site is

located within a rural residential zoning district. Accordingly,

American Tower required a conditional use permit from the

Planning Board.

The Planning Board's Consideration of the Tower Proposals

The Planning Board held public hearings on the plaintiffs'

application on July 18, 2000, September 19, 2000, October 3,

---

[3]About five months prior to submitting its application to
the Planning Board, American Tower sought input from the Board
regarding two sites it was considering for the construction of a
tower. On American Tower's behalf, the Town Planner requested
that the Board express its preference for the location of the
tower. Although the record indicates that American Tower was
never identified to the Board as the company proposing to build
the tower, it reveals that the Board expressed a preference for
the Northland Forest Site because it already was used for
commercial purposes. The record also reveals that when a Board
member asked whether the Town "could say no to this altogether,"
the Town Planner replied that "the Town could not deny it." The
plaintiffs assert that the Board's actions demonstrated
favoritism toward American Tower, unfairly prejudiced SBA/ATC and
were improper under New Hampshire law. Because I find that the
plaintiffs' substantial evidence claim is dispositive of the
parties' motions and I need not reach the state law claims, I
decline to evaluate whether the Town acted improperly in
considering American Tower's pre-application request for
guidance.

2000, and October 17, 2000.[4]  During the hearings, SBA/ATC

presented oral and documentary evidence in support of their

proposal.  The Planning Board also received comments from several

abutters opposed to the SBA/ATC tower.  During the July 18

hearing, four abutters spoke in opposition to the plaintiffs'

application.  Two of those individuals, Steven Blaisdell and Tina

Staublin, objected to the tower on aesthetic grounds.  The other

two abutters, Andrea and Almus Kenter, expressed concern about

health risks, the presence of wetlands and wildlife on the

Heffernan Site, and the tower's potential impact on the historic

value of the Heffernan property.  The Kenters and the Blaisdells

submitted letters challenging the proposal as well.  While the

Blaisdell letter focused on the tower's aesthetic impact, the

_____

[4]The plaintiffs accuse the Board of unfairly delaying
hearings on their application while expediting consideration of
American Tower's proposal.  Although the Board's disparate
treatment of the two proposals suggests that the plaintiffs'
assertions may have some merit, SBA/ATC voiced no objection to
the delays and in fact agreed twice in writing to extend the
hearing process.  Moreover, SBA/ATC did not elect to seek redress
for the delays under the TCA, which requires local governments to
act on any request for authorization to construct personal
wireless service facilities "within a reasonable period of time
after the request is duly filed . . . ."  42 U.S.C. §
332(c)(7)(B)(ii).

8

Kenter letter expressed a variety of concerns.[5]  A fifth abutter, who did not speak at any of the hearings, also submitted a letter calling the proposed tower an "eyesore," expressing significant fear about health risks and suggesting that the Heffernan property may have historic significance.[6]  SBA/ATC responded to these comments, both orally and in writing.

During the course of the public hearings on the plaintiffs' proposal, SBA/ATC altered its plans to accommodate the Board's request for a monopole rather than a lattice style tower. SBA/ATC also changed the proposed location of the tower in order to increase the distance between the tower and a neighboring property and reduce its visibility.

The Planning Board held public hearings on American Tower's proposal on September 5, 2000, September 19, 2000, October 3,

---

[5]In their letter, the Kenters objected to the fact that they would have a clear view of the tower from their property.  In addition, the Kenters expressed concern that the SBA/ATC plan might increase traffic, include insufficient ingress and egress to handle emergencies, involve the placement of a potentially dangerous fuel source on the property, and threaten health.  The Kenters also questioned whether the plaintiffs had submitted all of the materials required by the Kingston Telecommunications Facility Ordinance.

[6]A sixth abutter, a real estate business, submitted a letter requesting that the tower be set back at least two hundred feet from its property but expressing no opposition to the proposed plan.

2000, and October 17, 2000. American Tower presented oral and documentary evidence in support of its proposal. American Tower also obtained an easement from the property owner in order to satisfy the Board's desire that a buffer of mature trees be maintained around the tower.

In contrast to the SBA/ATC proposal, no abutters spoke or submitted correspondence in opposition to the American Tower plan. One Board member did note that American Tower's proposal was designed to accommodate only five personal wireless service carriers, while SBA/ATC's plan was designed to accommodate up to eight carriers.[7] Another Board member expressed concern about the tower's potential impact on Kingston's historic district, but no further action was taken on this issue.

Prior to voting on the SBA/ATC and American Tower plans, the Board obtained reports from its own technical consultant. After reviewing the SBA/ATC application, the Town's consultant confirmed that a significant coverage gap exists in the northern section of Kingston. He also determined that at 170 feet, the

---

[7]The record indicates that the plaintiffs' final tower proposal would have been capable of supporting six providers plus a municipal antenna facility. The defendant's assertion that the plaintiffs' proposed tower could accommodate only two providers finds no support in the record.

10

plaintiffs' proposed facility would close the gap and provide for sufficient overlap with the coverage afforded by the Crown and Brentwood towers to "facilitate adequate 'handoffs'."[8]  The Town's consultant also reviewed American Tower's application.  He determined that at 140 feet, American Tower's proposed facility also would close the coverage gap.  He noted, however, that at this height, the overlap with the coverage afforded by the Brentwood tower would be minimal.

The Planning Board Decision

On October 17, 2000, the Planning Board voted to approve only one of the two telecommunications tower applications on the grounds that the Telecommunications Facility Ordinance requires cooperation and co-location.  The Planning Board then voted to deny the plaintiffs' application for a conditional use permit and to grant American Tower's application for a conditional use permit.[9]

---

[8]A "handoff" refers to the ability to make the transition from coverage provided by an antenna on one tower to coverage provided by an antenna on another tower without losing communication.

[9]Following a tie vote on the motion to approve the plaintiffs' proposed tower, the Chairman of the Planning Board broke the tie by voting to deny the plaintiffs a conditional use permit.

11

Subsequently, the Planning Board issued a written Notice of Planning Board Decision in which it set forth its reasons for denying the plaintiffs' application. Specifically, the Board stated:

1) Based upon the purposes section of the Kingston zoning ordinance letters C and E it is the responsibility of the Kingston Planning board to provide for minimal impact siting and to require cooperation and coordination between telecommunications service providers in order to reduce cumulative negative impacts upon Kingston.

2) The location of this proposed location is in close proximity to residential abutters. While there are commercial uses backing into the property, the majority of the abutting and nearby properties are residential and of a rural nature. The siting of this tower does not meet the intent of the ordinance to reduce adverse impacts on neighborhood aesthetics.

3) The design of the tower does not prevent nor reduce visual intrusive\ness (sic) along the NH Route 125 corridor. Minimizing the adverse visual impact is required by the Town's ordinances.

4) The Planning Board hired a telecommunication consultant to assist in determining the technical viability of the SBA/ATC site. This consultant provided evidence that two proposed sites offered the same ability to cover existing service gaps. As a result, the SBA/ATC site failed to meet the standard of section D) of the Town's ordinance which indicates that all other reasonable opportunities have been exhausted. In addition Section VII., 3., paragraphs h and j require the Planning Board to consider other factors in making decisions that include the availability of existing

12

> towers and other structures and the availability of
> alternative siting locations.  The Planning board
> has done this with respect to this denial.

Following the Planning Board's adverse decision, SBA/ATC initiated this lawsuit asserting claims under the TCA and state law.

Analysis

A.   The Telecommunications Act of 1996

The provision of the TCA at issue in this case, 47 U.S.C. § 332(c)(7), "is a deliberate compromise between two competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers."  Town of Amherst v. Omnipoint Communications Enter., Inc., 173 F.3d 9, 13 (1st Cir. 1999).  "Under the TCA, local governments retain control 'over decisions regarding the placement, construction, and modification of personal wireless service facilities'."  Southwestern Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 57 (1st Cir. 2001)(quoting 47 U.S.C. § 332(c)(7)(A)).  Nonetheless, the TCA places certain limitations upon the exercise of local zoning authority:

> Local zoning authorities may not discriminate among
> providers of wireless telephone service, see §
> 332(c)(7)(B)(i)(I), act in a manner that effectively
> prohibits the provision of wireless telephone services,

13

> see § 332(c)(7)(B)(i)(II), or make zoning decisions based on concerns over the environmental or health effects of the radio emissions associated with wireless telephone service, see § 332(c)(B)(iv) . . . In addition, a zoning board's decision to deny permission to build a wireless service facility must be 'in writing and supported by substantial evidence contained in a written record'.

Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township, 181 F.3d 403, 407 (3d Cir. 1999)(quoting 42 U.S.C. § 332(c)(7)(B)(iii)).  See also Todd, 244 F.3d at 57-8. "Basically, the TCA gives local authorities the first say in determining where and how to construct [wireless communications facilities]; if, however, a local authority's actions violate the provisions of the TCA, a court has the authority to order the locality to take such steps as are necessary to grant the relief which the wireless provider had originally requested from the locality." Omnipoint Communications MB Operations, LLC v. Town of Lincoln, 107 F. Supp.2d 108, 114 (D. Mass. 2000).

B.    The Substantial Evidence Claim

SBA/ATC seek summary judgment on the grounds that Kingston's decision denying its application for a conditional use permit violated the TCA, 47 U.S.C. § 332(c)(7)(B)(iii), because it was not supported by substantial evidence contained in a written record.  While the plaintiffs concede that Kingston met the

14

requirement that its denial be "in writing," see Todd, 244 F.3d at 59 (the first requirement of section 332(c)(7)(B)(iii) is that denials of permits be in writing), they assert that the Board's decision lacked substantial support in the record. Kingston cross-moves for summary judgment on this issue.

"In considering whether substantial evidence supports the agency decision, the court is acting primarily in a familiar 'review' capacity ordinarily based on the existing record." Town of Amherst, 173 F.3d at 16 n.7. Accordingly, it is appropriate to resolve the substantial evidence question based upon the Planning Board record before this court. See id. at 16.

1. Substantial Evidence Standard of Review

"The TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable local zoning requirements." Town of Lincoln, 107 F. Supp.2d at 115 (citing Town of Amherst, 173 F.3d at 16). See also Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 72 (3d Cir. 1999)(the court's task is to determine "whether the decision, as guided by local law, is supported by substantial evidence"). The test is highly deferential to the Planning

15

Board, giving the Board "'the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy a reasonable factfinder'." Penobscot Air Servs. Ltd. v. Federal Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999)(quoting Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 118 S.Ct. 818, 828 (1998)). While the review is highly deferential to the Planning Board, however, it "'is not a rubber stamp'." Todd, 244 F.3d at 58-9 (quoting Penobscot Air Servs., 164 F.3d at 718 n.2). Thus, the court is not free to substitute its own judgment for that of the local zoning authority, but it must determine whether the local authority's decision is based on "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'." Penobscot Air Servs., 164 F.3d at 718 (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477 (1951)).

In evaluating the Kingston Planning Board's decision under the substantial evidence standard, this court must consider the evidence on the record as a whole, taking into account any evidence that is unfavorable or contradictory to the Board's decision. See Todd, 244 F.3d at 59; Penobscot Air Servs., 164

16

F.3d at 718.  The court will uphold the Planning Board's decision if it is reasonably based upon the evidence before it and not merely upon unsubstantiated conclusions.  See Town of Lincoln, 107 F. Supp. at 115.

>    2.    Application of the Substantial Evidence Standard
>          to the Kingston Planning Board's Decision

In its written decision, the Board provided four reasons for denying the plaintiffs' application.[10]  I find that none of the Board's reasons is supported by substantial evidence in the record.

>          a.    The Board's Responsibility to Provide for Minimal
>                Impact Siting and to Require Cooperation

The first reason for denying the plaintiffs' application, based upon two provisions of the Telecommunications Facility Ordinance's purpose and goals section, concerns Kingston's responsibility to provide for minimal impact siting and to require cooperation and coordination between telecommunications

_____

[10]The reasons for denying the plaintiffs' application that are set forth in the Board's written decision are consistent with the reasons listed in the record of the October 17, 2000 public hearing at which the Board voted to deny the plaintiffs' request for a conditional use permit.

service providers.[11]  The provisions of the Ordinance upon which the Board's decision relies encourage both cooperation between competitors and co-location to the highest extent possible.

There is no substantial basis in the record to support the Board's denial based upon the Ordinance's goal of requiring cooperation between competitors.  SBA/ATC filed an application for a conditional use permit two months prior to American Tower.  At the time, there were no other competitors with whom to cooperate in order to close the defined coverage gap in Kingston.  Moreover, the fact that SBA/ATC and American Tower failed to cooperate to develop a single tower plan provides no justification for selecting American Tower's proposal over the plaintiffs' proposal.  Both entities are equally responsible for any lack of coordination.

Moreover, the record indicates that the plaintiffs' proposal would have best fulfilled the Ordinance's goal of requiring co-location to the highest extent possible.  Although both SBA/ATC and American Tower provided assurances to the Board that they

_____

[11]Although the Board's decision refers to the goal of requiring cooperation and coordination between "telecommunications service providers," the Ordinance states that its aim is to "[r]equire cooperation and co-location, to the highest extent possible, between competitors . . . ."

18

would allow service providers to co-locate on their towers, the record reveals that the SBA/ATC tower would have been capable of supporting more antenna facilities than the American Tower structure, thereby maximizing the potential for co-location. In addition, the record shows that SBA/ATC had secured commitments from three service providers willing to locate antennas on their tower, while American Tower presented evidence of just one service provider willing to locate an antenna on its tower.[12] This is further evidence that the Board's first reason for denying the plaintiffs' application lacked substantial support in the record.

        b.    <u>The Proposed Tower's Proximity to Residences and Impact on Aesthetics</u>

The Board's second reason for denying the plaintiffs' proposal concerned the close proximity of the Heffernan Site to

---

[12]The plaintiffs argue that in fact no service providers made commitments to locate antennas on American Tower's facility. Instead, the plaintiffs assert, one service provider, Cellular One, wrote a letter expressing an "interest" in using the American Tower structure. The plaintiffs further suggest that the interest was not genuine because the letter, while written on Cellular One letterhead, was signed by an American Tower employee. The Board was entitled to rely on American Tower's representation that Cellular One was willing to use its tower. Moreover, there is nothing in the record that would have alerted the Board to any possibility that the Cellular One letter was not genuine or did not accurately reflect Cellular One's position.

19

residential abutters and the failure of the proposed plan to reduce adverse impacts on neighborhood aesthetics. While the record supports the Board's conclusion that the Heffernan Site lies in close proximity to residential abutters, the record also demonstrates that the Northland Forest Site abuts several residential properties. There is no indication, however, that the Board evaluated or discussed the impact, if any, that the American Tower proposal would have on neighboring residences.[13] Nor is there any indication that the Board compared the impact that the SBA/ATC tower would have on surrounding residences with the impact that the American Tower structure would have on neighboring residences. Accordingly, the residential character of the community surrounding the Heffernan Site, without more, provides inadequate justification for the Board's decision to select American Tower's proposal over the plaintiffs' proposal.

---

[13]The record contains photographic simulations illustrating the view of the tower from several locations, but none of the photographic simulations appears to depict the view from abutting residential properties. The record also contains photographs depicting the results of a crane test, but there is no description of the photographer's location. Moreover, the record of the September 19, 2000 hearing before the Board suggests that the crane was difficult to see and that a balloon test, the results of which are not included in the record, afforded greater visibility.

Similarly, the Board's conclusion that the plaintiffs' proposed tower would not meet the intent of the Ordinance to reduce adverse impacts on neighborhood aesthetics lacks substantial support in the record. Nothing in the TCA prevents municipalities from restricting and controlling development based upon aesthetic considerations. Todd, 244 F.3d at 61. "Nonetheless, that aesthetic judgment must be grounded in the specifics of the case." Id. Consequently, a "few generalized expressions of concern with 'aesthetics' cannot serve as substantial evidence on which the Town could base the denial[]." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 496 (2d Cir. 1999). See also Pine Grove, 181 F.3d at 409; Nextel Communications of the Mid-Atlantic, Inc. v. Manchester-By-The-Sea, 115 F. Supp.2d 65, 72 (D. Mass. 2000); Telecorp Realty, LLC v. Town of Edgartown, 81 F. Supp.2d 257, 260 (D. Mass. 2000).

The Kingston Planning Board received only a small number of complaints from neighbors objecting to the SBA/ATC tower on aesthetic grounds,[14] and only the Kenters and the Blaisdells provided any specific reasons for their opposition to the tower's

_____

[14]The abutters opposing the plaintiffs' tower proposal on aesthetic grounds included the Kenters, the Blaisdells, Tina Staublin and Mariah Champagne.

21

visual impact.  Moreover, several abutter comments had nothing to do with aesthetics.  For instance, several comments raised concern about potential health risks, a factor that the Board could not consider under the TCA.  Other comments, notably those contained in a detailed letter from the Kenters, raised concern about the potential for increased traffic, the sufficiency of the access road, the possibility that a fuel source could be placed at the property, and the plaintiffs' compliance with certain portions of the Ordinance.[15]  Neither the volume nor the specificity of the opponents' comments provided enough evidence that the plaintiffs' proposed tower would have an adverse aesthetic impact on the neighboring community to support the Board's denial.  See Pine Grove, 181 F.3d at 409 (no substantial evidence supporting denial of permission to build a tower on aesthetic grounds where only eleven residents expressed general complaints through one spokesman); Town of Oyster Bay, 166 F.3d at 495-96 (no substantial evidence to support permit denials where very few residents expressed non-specific aesthetic

---

[15]The plaintiffs addressed the comments raised by the abutters.  Neither the record nor the Board's ultimate decision indicate that there was any substantial evidence to support a denial of the plaintiffs' application based upon any of the issues raised by abutters opposing the application.

concerns).  But see Todd, 244 F.3d at 62 (substantial evidence of adverse visual impact available where record demonstrated that proposed tower was of a different magnitude than anything else in the vicinity and would be seen year round by 25% of the Town's population);  360 Degrees Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle County, 211 F.3d 79, 84 (4th Cir. 2000)(substantial evidence supported denial of permission to construct a tower where the proposal triggered virtually unanimous citizen opposition and tower would be inconsistent with the county zoning scheme).

The provision of the Ordinance declaring an intent to reduce adverse impacts from telecommunications facilities on aesthetics seeks to reduce adverse impacts from telecommunications facilities on historically significant locations as well. Nevertheless, the Board failed to consider the impact of the American Tower proposal on nearby historic properties and to compare that impact, if any, to the SBA/ATC proposal.  The record reveals that the Northland Forest Site lies within one-half mile of four historic properties and that one Board member expressed concern about the tower's potential impact on Kingston's historic district.  The Board, however, neglected to further consider the

23

matter.  Having failed to evaluate the full impact of each proposal on nearby properties, the Board cannot justify its decision to deny the plaintiffs' application on aesthetic grounds.

c.    Visual Intrusiveness Along Route 125

The third reason that the Board gave for denying the plaintiffs' application for a conditional use permit concerned the proposed tower's failure to prevent or reduce visual intrusiveness along Route 125.  This reason too lacks substantial justification.  Although photographic simulations of the SBA/ATC tower indicate that the tower would be visible from Route 125, photographic simulations of the American Tower structure indicate that it too would be visible from Route 125.  In fact, the American Tower simulations appear to confirm what an American Tower representative stated at the September 5, 2000 Planning Board Hearing – that the clearest view of the tower would be from Route 125.  Accordingly, visual intrusiveness along Route 125 provides no support for the Board's decision to select the American Tower plan over the SBA/ATC plan.

d.    Failure to Exhaust Alternative Opportunities

The Board's final reason for denying the plaintiffs'

application was that in light of the Town consultant's conclusion that the SBA/ATC proposal and the American Tower proposal offered the same ability to cover the existing service gap, SBA/ATC had failed to exhaust all other reasonable opportunities. To justify this conclusion, the Board referred to provisions of the Ordinance that require the Board to consider the availability of existing towers and alternative siting locations.

The Board's reasoning falters for several reasons. First, although the Town's consultant determined that both tower proposals would close the identified service gap, the consultant's report raised a question as to whether the coverage provided by the American Tower proposal would overlap enough with the coverage afforded by the Brentwood tower to facilitate adequate handoffs. Second, even assuming both towers could provide the same level of service, the plaintiffs submitted their application a full two months ahead of American Tower. Consequently, the suggestion that American Tower's plan provided a reasonable alternative to the SBA/ATC plan lacks any support in the record. Given the fact that the plaintiffs' proposal was before the Board by the time American Tower submitted its application, it was American Tower, not SBA/ATC, that failed to

25

exhaust all other reasonable opportunities and consider alternative towers or structures. Third, the provisions of the Ordinance that require the Board to consider the availability of existing towers and the availability of alternative tower structures and siting locations presume that other structures or siting locations are available. The record demonstrates that at the time the plaintiffs submitted their application, no other suitable towers or structures were available within the Town of Kingston that would have provided coverage for the existing service gap. Furthermore, during the course of the public hearings, no questions or issues were raised regarding the plaintiffs' failure to consider alternative siting locations. Again, the Board's conclusions find no adequate support in the record.

C.   Appropriate Remedy

The plaintiffs request injunctive relief in the form of an order directing the defendant to issue all permits and approvals necessary to enable the plaintiffs to construct a wireless telecommunications tower at the Heffernan Site. Although the TCA does not specify a remedy for violations of the statute, most courts that have decided these cases have held that the

appropriate remedy is injunctive relief in the form of an order to issue the necessary permits. See Town of Oyster Bay, 166 F.3d at 497 (citing cases). Consistent with the weight of authority, I find that the plaintiffs are entitled to the requested injunctive relief.

Having determined that the plaintiffs are entitled to an injunction that will afford them full relief, I decline to address the plaintiffs' effective prohibition and state law claims. Accordingly, the parties' cross-motions for summary judgment as to those claims will be denied as moot.

## Conclusion

The plaintiffs' motion for summary judgment (document no. 11) is granted with respect to the substantial evidence claim, and is otherwise denied as moot. The defendant's cross-motion for summary judgment (document no. 9) is denied.

## Order

The court orders that the Kingston Planning Board's decision denying the plaintiffs' application to construct a wireless telecommunications tower on the Heffernan Site is null and void. The court further orders the Town of Kingston, its officers, boards, commissions, departments and instrumentalities, including

its Planning Board, to approve the plaintiffs' application, issue all necessary permits and remove any further impediments to the plaintiffs' construction of the proposed tower within forty-five days of the date of this Order. The Clerk is instructed to close the case.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: November 8, 2001

cc:    Steven E. Grill, Esq.
      Robert D. Ciandella, Esq.