**SPRINT SPECTRUM, L.P., Plaintiff,**

v.

**TOWN OF OGUNQUIT,
et al., Defendants.**

**No. 01–137–P–DMC.**

United States District Court,
D. Maine.

Dec. 12, 2001.

Catherine R. Connors, David P. Littell, Pierce, Atwood, Portland, ME, Wayne F. Dennison, Amanda Buck Varella, Brown, Rudnick, Freed & Gesmer, Boston, MA, for plaintiff.

Mark V Franco, Thompson & Bowie, Jeffrey T. Edwards, Roy T. Pierce, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, for defendants.

## *MEMORANDUM DECISION ON CROSS-MOTIONS FOR JUDGMENT ON A STIPULATED RECORD* [1]

COHEN, United States Magistrate Judge.

Plaintiff Sprint Spectrum, L.P. ("Sprint") and defendants the Town of Ogunquit (the "Town"), the Town of Ogunquit Planning Board ("Board") and certain named individuals [2] acting in their official capacities (collectively, "Defendants") cross-move for judgment on a stipulated record in this action arising from the Board's denial of Sprint's request to attach a wireless-service antenna to an existing HAM radio tower in the Town. Plaintiff's Motion and Brief in Support of Judgment in Its Favor on the Stipulated Record ("Plaintiff's Motion") (Docket No. 9); Defendants' Cross–Motion and Brief in Support of Judgment in Their Favor on the Stipulated Record ("Defendants' Motion") (Docket No. 11). For the reasons that follow, both motions are granted in part and denied in part.

## I. Applicable Legal Standards

In this case the parties agree, and the operative scheduling order directs, that "every claim asserted can be resolved based on the evidence presented in the Administrative Record. Therefore, ... this case may be resolved on briefs alone." Joint Motion To Amend the Scheduling Order, etc. ("Motion To Amend") (Docket No. 7) at 2 & endorsement thereon. "In a case submitted for judgment on a stipulated record, the district court resolves disputed issues of material fact." *Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 31 (1st Cir.2000) (citation omitted).

The parties further agree, and the scheduling order also directs, that "[w]hile resolution shall occur through a judgment

---

**1.** Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all proceedings in this case, including trial, and to order entry of judgment.

**2.** Sprint's complaint names the following individual defendants: Henry Hokans, Wayne Fette, Albert Dello Russo, Thomas Hagerty, Ernest Sadowl and Susan Starobin, acting in their capacities as members of the Board, and Paul Lempicki, acting in his capacity as code enforcement officer for the Town. Complaint (Docket No. 1) at 1.

on the Stipulated Record, to facilitate the court's review, the parties shall follow F.R.Civ.Rule 56 and Local Rule 56, in that they shall accompany their Briefs with supporting Statements of Material Fact." Motion To Amend at 2 & endorsement thereon.

## II. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Loc. R. 56, reveal the following relevant to this decision:

Sprint is in the process of building a nationwide wireless personal communications services ("PCS") network across the United States, using a new generation of technology. Plaintiff's Statement of Material Facts ("Plaintiff's SMF") (Docket No. 10) ¶¶ 1, 67; Defendants' Reply to Plaintiff's Statement of Material Facts ("Defendants' Reply SMF") (Docket No. 13) ¶¶ 1, 67.

In 1997 Sprint was the highest bidder at an auction held by the Federal Communications Commission for PCS wireless broadcast licenses covering Maine, New Hampshire, Massachusetts and other New England states. *Id.* ¶ 1. Sprint currently is actively building out its PCS system in Maine. *Id.* Sprint prefers to locate its wireless telecommunications facilities on either an existing building or an existing tower. *Id.* ¶ 2. If an appropriate preexisting structure cannot be located, Sprint provides service by constructing a new tower. *Id.*

The Town is a municipal corporation located in York County, Maine. *Id.* ¶ 3. The Board is a governmental agency established by and existing under the au-

thority of the Town, with its only office in Ogunquit, Maine. *Id.* Defendants Hokans, Fette, Dello Russo, Sadowl, Hagerty and Starobin are residents of Ogunquit and served as the members of the Board that denied Sprint's application for a special exception. *Id.* ¶ 4. Defendant Lempicki serves as the code enforcement officer for the Town. *Id.* ¶ 5.

In 1994 Bruce Marton received a building permit from the Town allowing him to build four one-hundred-foot radio towers on his property. Defendants' Reply SMF ¶ 6; Record, Tab 14, at 1. Marton proceeded to construct the radio towers through 1999, when the Town issued a stop-work order. Plaintiff's SMF ¶ 7; Defendants' Reply SMF ¶ 7. Marton appealed the stop-work order to the Town's Zoning Board of Appeals ("ZBA"), which denied his appeal. *Id.* He then appealed to the Superior Court, which vacated the ZBA decision and rescinded the stop-work order. *Id.* The Town appealed the Superior Court's order to the Maine Supreme Judicial Court, which ruled that Marton was entitled to construct his towers pursuant to the 1994 permit. *Id.* Marton has fully constructed one ninety-nine-foot HAM radio tower. *Id.*

On February 26, 2001 Sprint submitted a special exception application (the "Application") to the Board seeking authorization to place a telecommunications antenna array on the existing ninety-nine-foot HAM radio tower, located at 131 Maine Street, Ogunquit, Maine (the "Tower"). *Id.* ¶ 8. The Tower is located in an area defined by the Ogunquit Zoning Ordinance (the "Ordinance") as General Business District 1 ("GBD1"). *Id.*[3]

---

**3.** The Town is divided into fourteen zoning districts, including general business districts (GBD1/GBD2) and a farm district (FD). Defendant Town of Ogunquit's Statement of Ma-

terial Facts ("Defendants' SMF") (Docket No. 12) ¶ 1; Plaintiff's Reply Statement of Material Facts ("Plaintiff's Reply SMF") (Docket No. 15) ¶ 1.

The Application proposed a flush-mounted three-panel antenna array attached to the Tower at a center-line height of seventy-seven feet, with no portion of the antenna array over eighty feet above ground level. *Id.* ¶ 10. Sprint further proposed to locate associated radio and powering equipment at the base of the Tower in a twelve-foot-by-twenty-two-foot compound connected to the antenna array via coaxial cable, thereby establishing a wireless communications facility ("Facility") on the property. *Id.* The Facility would connect with adjacent sites in York, Wells and South Berwick and provide coverage to the residents of Ogunquit, York and Wells as well as to travelers on U.S. Route One. *Id.* ¶ 25.[4] The Marton site had "been on Sprint's radar screen" since 1997. Defendants' SMF ¶ 15; Record, Tab 36, at 12.

With the Application, Sprint submitted (i) a cover letter describing the proposal, (ii) an addendum addressing the Ordinance's special-exception and design-review criteria, (iii) a structural engineering letter regarding the Tower, (iv) an affidavit of a real estate expert, (v) an affidavit of Sprint's radio frequency ("RF") engineer, (vi) a copy of Sprint's lease with the Tower owner,[5] (vii) a viewshed analysis of what the Tower would look like with the three-panel, flush-mounted antennas attached and (viii) engineering plans for the proposed facility. Plaintiff's SMF ¶ 8; Defendants' Reply SMF ¶ 8.

These attachments indicated *inter alia* that given the Ordinance's prohibition of construction of new towers within the GBD1 and RD zoning districts and the lack of other structures of equal or similar height to the Tower in the area, Sprint was unable to find any tower or attachment site in that part of Ogunquit. Plaintiff's SMF ¶ 45; Record, Tab 1, Exh. C, ¶ 6 & Exh. E, ¶ 12. According to these materials Sprint had concluded, based on its review of alternative sites, that the proposed site was the only feasible site for the provision of service to downtown Ogunquit and Route One. *Id.*[6]

The affidavit of RF expert Nooshin Zareian filed with the Application indicated

---

4. Sprint's further assertion that the Facility "would address a substantial coverage gap in its wireless telecommunications network," Plaintiff's SMF ¶ 25, is neither admitted nor supported by the citations given. However, as discussed below, I find as a matter of law that the cognizable facts do support a finding that the Facility would address a substantial coverage gap in the wireless network.

5. The lease ran for a term of five years. Defendants' SMF ¶ 7; Plaintiff's Reply SMF ¶ 7.

6. The Defendants protest that the real estate appraiser upon whom Sprint relied for the proposition that no other feasible structures exist in that part of Ogunquit lacked the qualifications and foundation to render such an expert opinion. Defendants' Reply SMF ¶ 45. I decline to consider the objection on two bases. First, both parties waived any objection to the admissibility of the Record as evidence relevant to prove or disprove any claim asserted in the Complaint, stating their intent that "the court treat the contents of the Administrative Record as if the documents and testimony reflected therein were admitted at trial." Stipulation Regarding the Evidentiary Record (Docket No. 8) ¶¶ 3–4. Second, the objection is in any event too conclusory to address, with the Defendants neither articulating its grounds nor offering any documentation in support. The Defendants' further statements that "[t]he record demonstrates that Sprint PCS did not necessarily test all other possible locations in this part of Ogunquit" and that Sprint has failed to provide documentation supporting its position that the Tower is the only feasible site, Defendants' Reply SMF ¶ 45, are disregarded inasmuch as they are neither admitted nor supported by the citations given. For example, Board member Dello Russo states, "We haven't seen any documentation of an engineering nature," Record, Tab 38, at 15, not that the Board had seen no documentation whatsoever.

that if Sprint were not granted the special exception it would "have to construct a new tower facility in order to provide adequate service coverage to Ogunquit." Defendants' SMF ¶ 7; Plaintiff's Reply SMF ¶ 7. Zareian also noted, "unlike other parcels of land in the area, the Site [the Tower] has unique radio frequency characteristics due to the topography of the Site, the height of the existing amateur radio tower, and its location within the narrow search area specified by Sprint PCS's service area computer model which make it especially suitable for Sprint PCS's proposed wireless telecommunications transmission facility." Plaintiff's Reply SMF ¶ 7; Record, Tab 1, Exh. E, ¶ 11.

On March 8, 2001 Sprint representatives met with Lempicki and the town planner, who stated that the Board would require evidence that the Tower was in use as an amateur radio service facility. Plaintiff's SMF ¶ 11; Defendants' Reply SMF ¶ 11. On March 12, 2001 the Board considered the Application and voted that it was complete as required under the Ordinance. *Id.* ¶ 12. At the commencement of the completeness hearing, Board Chairperson Hokans stated:

> If we are going to allow this application to go forward and that is a question, because we can say no tonight. I think we have enough evidence to say that they can't meet the tests our Ordinance demands that they meet. But if you decide to allow it to go forward then we need to set a public hearing and get, see how the public feels about it. My personal opinion is that there is probably

enough evidence in our hands at this moment to turn [the Application] down cold. I don't think they have presented any kind of a case that says this is an acceptable accessory use. We have evidence from minutes of previous meetings that very clearly state that these towers were to have no commercial use. Defendants' Reply SMF ¶ 12; Record, Tab 36, at 20. The Board posed numerous questions and issues for Sprint to address in subsequent meetings, Plaintiff's SMF ¶ 12; Defendants' Reply SMF ¶ 12, and requested evidence regarding Marton's use of the Tower, Plaintiff's SMF ¶ 12; Record, Tab 36, at 4.[7]

Sprint considered numerous alternatives to siting its proposed Facility on the Tower. Plaintiff's SMF ¶ 48; Record, Tab 6, at 3–5; Tab 15, at 1 & Letter dated April 19, 2001 from Nooshin Zareian to Ogunquit Planning Board ("Zareian Letter"), attached thereto; Tab 37, at 15–16, 33–38; Tab 38, at 1–5.[8] By letter dated March 30, 2001 Sprint described ten alternate locations investigated since 1997 to provide service to Ogunquit and Route One. Plaintiff's SMF ¶ 43; Defendants' Reply SMF ¶ 43. Sprint provided this partial listing in response to Board member Starobin's request for "a piece of paper" with "documentation of the other sites that were reviewed." Plaintiff's Reply SMF ¶ 13; Record, Tab 36, at 19.

According to the letter, to which no supporting documentation was attached, Defendants' SMF ¶ 13; Record, Tab 6, alternative sites investigated included: a logging road on land owned by Perkins at

---

7. Sprint's further assertion that the "Board's primary focus in this meeting was Mr. Marton's use of the Tower," Plaintiff's SMF ¶ 12, is neither admitted nor fully supported by the citations given and hence is disregarded.

8. The Defendants' qualification that Sprint "failed to provide any technical or other evi-

dentiary support for its conclusions that these alternative sites were inadequate or infeasible for a wireless communications facility," Defendants' Reply SMF ¶ 48, is disregarded inasmuch as it is neither admitted nor supported by the citations given.

coordinates 43–13–45.3 and 70–36–22.5; CMP transmission lines on Route One; a new tower on the Marton property; a site in northern York on Birch Knoll; a church steeple at the base of School Street; an existing water tank to the northwest of the ridgeline; a short stealth tower on municipal land; visitor information property in Ogunquit; the Lookout Condominiums; and the Ontio Condominiums, Plaintiff's Reply SMF ¶ 13; Record, Tab 6, at 4. The letter states that three of these sites were rejected because they did not offer sufficient RF coverage of downtown Ogunquit and Route One, four were rejected because the owners (in one case the Town) declined to consider an agreement with Sprint for the site, one was rejected by the Town Selectpersons and two had zoning that barred the new towers necessary for installation of a wireless facility. *Id.*

The stealth-tower site, previously negotiated with the Ogunquit Police Department as a co-development stealth communications tower, was presented to the Town Selectpersons only to be rejected in April 1998. Plaintiff's SMF ¶ 43; Defendants' Reply SMF ¶ 43. In April 1998 the town also declined pursuit of discussions regarding the siting of a tower on the visitor information property. *Id.*

On April 2, 2001 the Board conducted a public hearing regarding the Application. *Id.* ¶ 15. Sprint presented the Application through its attorney, David Littell, its senior RF engineer, Zareian, its property expert, Patricia Amidon, and its site acquisition and zoning specialist, Peter Cooke. *Id.* At the hearing Cooke testified regarding the sites described in the March 30 letter. Plaintiff's Reply SMF ¶ 13; Record, Tab 37, at 15–16. Sprint also explained that the list of ten alternative sites was only a partial listing because many people had been involved in the four-year

process of site identification and evaluation and it was thus likely that some sites were omitted. Plaintiff's Reply SMF ¶ 13; Record, Tab 37, at 73–74.

Cooke testified that to the best of Sprint's "knowledge, there are no other sites currently available or currently leased on property for other carriers. Most carriers, that we are aware of, now have coverage in York and Wells, but there are no sites specifically in Ogunquit at this time." Defendants' Reply SMF ¶ 24; Record, Tab 37, at 15. He further explained that although there was a tower in York with one carrier on it, that carrier did not have coverage in downtown Oqunquit or Route One from that site. Plaintiff's Reply SMF ¶ 15; Record, Tab 37, at 37. In addition, at the hearing Board Chair Hokans stated, "I can't get a good signal with my AT & T." Plaintiff's Reply SMF ¶ 15; Record, Tab 37, at 57. A member of the public also said that he could not get a clear signal in town. *Id.*

Members of the public testified both for and against the Application. Plaintiff's SMF ¶ 15; Defendants' Reply SMF ¶ 15. One of the abutters to the Marton property noted that the Town previously had voted to locate all cell towers in the Farm District. Defendants' SMF ¶ 17; Plaintiff's Reply SMF ¶ 17. One resident noted that Marton's towers were designed only for HAM radio use and not for commercial application. *Id.* Another resident cited the lack of options presented by Sprint, adding that when looking back at the Town from the ocean the Tower "is like a sore thumb sticking up out of the hill." *Id.*

Zareian testified that a design change such as numerous short installations would cause

> [t]he noise of the other system [to] go up and the quality of the conversation [to] go down. That is why the way that we do design for CDMA requires that we

find the optimum height and optimum location. If I changed the design, the technology that I am using is not going to work. That is going to generate more interference for me and the quality of conversation and form will go down. That is why I prefer to have the optimum height and optimum location.

Plaintiff's Reply SMF ¶ 13; Record, Tab 37, at 35. She explained, "[I]f you have a very flat area, and you have an optimum height of one hundred fifty feet, the maximum that our signal can travel is two miles in radius." Plaintiff's Reply SMF ¶ 13; Record, Tab 37, at 30–31. She testified that "the minimum required height to get the coverage we wanted out of this site, is 80 feet." Plaintiff's Reply SMF ¶ 13; Record, Tab 37, at 29.

At the hearing Lempicki explained his concern that Sprint's use of the Tower would be twenty-four hours a day, seven days a week and therefore this would be the principal use, rather than an accessory to the HAM radio use. Defendants' SMF ¶ 16; Record, Tab 17, at 6. Hokans explained his concern about the temporary nature of the Tower; specifically, that the Ordinance states that when use of a tower as a HAM radio site stops, the tower must be removed. *Id.* Dello Russo reiterated these concerns and also raised the issue of the aesthetics of the Tower. Defendants' SMF ¶ 16; Record, Tab 17, at 8. The Board posed additional questions to Sprint, and Board members requested more information regarding Sprint's evaluation of alternative sites. Plaintiff's SMF ¶ 15; Defendants' Reply SMF ¶ 15.

In an April 23, 2001 letter, Sprint addressed questions by various Board members regarding alternative sites and concepts, including different towers at different heights and use of an existing water tower site to the northwest of the ridgeline in combination with a church steeple. Plaintiff's Reply SMF ¶ 14; Record, Tab 15, at 1 & Tab 37, at 30–35, 46. Sprint enclosed a letter from Zareian dated April 19, 2001. Plaintiff's Reply SMF ¶ 14; Zareian Letter.

In her letter Zareian concluded that the water-tank site was infeasible based on computer modeling of the site and an RF analysis that demonstrated that the ridgeline between the site and both downtown Ogunquit and Route One would block the desired coverage. Plaintiff's Reply SMF ¶ 14; Zareian Letter at 1. With respect to the church steeple, Zareian concluded *inter alia* that an installation at that site would fill only fifty percent of the current hole in coverage, making it inadequate from an RF perspective. *Id.* In addition, Zareian analyzed the church steeple and the water-tank installations operated together, determining that additional sites beyond these two would be required to provide full coverage to downtown Ogunquit and Route One as it passes through Ogunquit. Plaintiff's Reply SMF ¶ 14; Zareian Letter at 2. Zareian also addressed the possibility of cooperating with the police on a new tower in the downtown area, representing that the police expressed disinterest in constructing a new tower inasmuch as they intended to use the existing water-tank property located to the northwest of downtown. Plaintiff's Reply SMF ¶ 14; Zareian Letter at 1–2.

Zareian further stated, "There are no installations in any municipalities in Maine, New England or nationwide which have utilized a series of very small PCS sites to provide full area coverage. This is not feasible because of the expense involved even if it would be allowed by zoning." Plaintiff's Reply SMF ¶ 14; Zareian Letter at 2. According to Zareian, each site costs between $100,000 and $500,000. *Id.*

The Board held meetings on April 23 and 25, 2001 to consider the Application,

stating that Sprint should do more to locate on a future Ogunquit police department tower. Plaintiff's SMF ¶ 17; Defendants' Reply SMF ¶ 17. Dello Russo also again suggested to counsel for Sprint that Sprint explore the possibility of placing an antenna on the water-tower site. Defendants' SMF ¶ 19; Record, Tab 18, at 8. Asked whether the entire Board shared Dello Russo's views regarding the water-tank site, Hokans responded that it did. Plaintiff's Reply SMF ¶ 19; Record, Tab 39, at 8–10.

The Board suggested that if Sprint proposed co-location of the Facility on a municipal tower being developed by the police department on water-district property, the Board would find Sprint's use an accessory to the municipal use and likely permit it. Plaintiff's SMF ¶ 46; Record, Tab 38, at 4 & Tab 39, at 8–9. Board members discussed the likelihood of approval of the prospective police site based on "health safety involving police and fire." Plaintiff's Reply SMF ¶ 19; Record, Tab 39, at 9. Dello Russo stated that once the police tower was up, Sprint would "make a stronger application to being an accessory to something that is legal." *Id.* At the time of the April 25, 2001 meeting at which the Board finalized its Findings of Fact, the final height of the proposed municipal tower was not yet determined, and there was no application pending before the ZBA. Plaintiff's SMF ¶ 47; Defendants' Reply SMF ¶ 47.

Sprint had evaluated the water-tank site prior to the Board's inquiries regarding it. Plaintiff's SMF ¶ 44; Record, Tab 37, at 15–16 & Tab 38 at 1. The water-tank property is located in the Residential District, where, according to Table 702.1, wireless telecommunications facilities are prohibited. Plaintiff's SMF ¶ 44; Record, Tab 37, at 46–47 & Tab 29, at 45.[9] Inasmuch as a high ridgeline runs between the water-tank property and the intended service area, Sprint determined that this site was also technically infeasible. Plaintiff's SMF ¶ 44; Zareian Letter; Record, Tab 38, at 1–2. Sprint indicated that it did an RF analysis of the water tower but did not actually test the water tower itself. Defendants' Reply SMF ¶ 44; Record, Tab 38, at 1–2.[10] To conduct an actual RF test on a particular site, radio test equipment and a crane to suspend that equipment would need to be placed on the property. Plaintiff's Reply SMF ¶ 19; Record, Tab 37, at 13.

On April 23, 2001 the Board voted unanimously to deny the Application. Defendants' SMF ¶ 18; Plaintiff's Reply SMF ¶ 18. When Hokans called for a vote, an unidentified Board member made a motion that the Board deny the Application and submit later findings. Defendants' Reply SMF ¶ 18; Record, Tab 38, at 16. Hokans responded that the "motion has got to be based on something." *Id.* The Board member suggested it be based on the Board's attorney's conclusions. *Id.*[11] The

---

9. At the April 2 hearing Hokans stated, "The way the water tank is zoned—it's in a residential zone and we would not allow the use either for a tower or by a co-location." Plaintiff's Reply SMF ¶ 13; Record, Tab 37, at 46.

10. The Defendants' assertion that "Sprint PCS did not discuss with the police department its interest in placing a tower on the water district property and how that might impact Sprint PCS," Defendants' Reply SMF

¶ 44, is disregarded inasmuch as it is neither admitted nor supported by the citation given.

11. In a letter dated April 20, 2001 attorney Jeffrey T. Edwards had written to Hokans concluding that the Application constituted the enlargement and intensification of a nonconforming structure, which was specifically prohibited by the Ordinance. Defendants' Reply SMF ¶ 18; Record, Tab 14, at 3. In addition, Edwards expressed reservations about whether the proposal would constitute

Board stated that the Application did not meet the fourth criterion of Ordinance § 6.6(A) because (i) it violated Ordinance §§ 3.3(H), 3.3(B), 3.3(C) and 3.1(A), (ii) the equipment structures were accessory to an accessory use, (iii) the Board believed the applicant had failed to explore other alternative locations and (iv) the Board did not wish to confer permanent status on a tower it believed to be temporary. Plaintiff's SMF ¶ 18; Defendants' Reply SMF ¶ 18.

The Board characterized its April 23, 2001 deliberations and vote to deny the Application as "preliminary Findings of Fact." *Id.* ¶ 19. It met again on April 25, 2001 to finalize its written decision. *Id.* ¶ 21. The final decision ("Denial") set forth the following nine reasons for the Board's action:

i. The application is in conflict with Section 3.3H of the Ogunquit Zoning Ordinance in that the proposed use would be an intensification of the use of a non-conforming structure as the existing tower is non-conforming as to height.

ii. The application does not meet the definition of "accessory use" as contained in Articles 2 and Section 9.16.A of the Ogunquit Zoning Ordinance. Also, the twenty-four (24) hour a day, seven (7) day a week use of the proposed antennae would, in effect, become the new principal use of the structure and the ham radio operation would then become the accessory use.

iii. The applicant proposes to construct a new structure, i.e., an equipment containment structure, which is not an accessory for the current principal use of the tower, but rather is an accessory to another proposed accessory use.

iv. The Board feels that the applicant has other alternatives available that have not been adequately explored. For example, the Ogunquit Police Department has its own engineering information indicating that it intends to locate its own communications tower in another location away from the area proposed by the applicant. The Ogunquit Police Department through its Chief, Andrew Theriault, and its Lieutenant, David Johnson has indicated a willingness and interest in developing a co-location with the applicant.

v. The Planning Board does not wish to confer permanent status to a tower that they believe to be temporary based on the required residence on the property of a licensed ham radio operator. The Town, in its perpetual interest, believes at some point, that the ham radio tower will be removed, therefore, in granting this application the Planning Board feels it would confer permanent status to a tower that the Planning Board believes is temporary. Further, any future ham radio tower would not be allowed to be built in the same location and at a similar height as the existing tower (Article 9.17.1 of the Ogunquit Zoning Ordinance).

vi. Article 3.1.A of the Ogunquit Zoning Ordinance reads as follows:

"Any use of land, or any building, or parts thereof, legally existing at the time of the adoption of the Ordinance, or at the time a zone or regulation is changed by amendment hereafter, which does not conform to the use

an accessory use within the meaning of the Ordinance. Defendants' Reply SMF ¶ 18;

Record, Tab 14, at 5.

requirements of this Ordinance or its amendments, may continue, but may not be expanded, reconstructed, or structurally altered except as specified below."

vii. Article 3.3.B of the Ogunquit Zoning Ordinance reads as follows:

"A non-conforming building or structure may be maintained or repaired but no alterations which alter the essential use, density, footprint or facade shall be made except those required or permitted by law or Ordinance."

viii. The Planning Board finds that the tower and the proposed attached PCS antennae are not aesthetically in keeping with the Design Review criterion (*See Southwestern Bell Mobile Systems, Inc. v. Todd, et al.*, 244 F.3d 51 (1st Cir.2001)) (also reference Article 11 of the Ogunquit Zoning Ordinance).

ix. Citing the lack of coverage for its wireless communications customers, the applicant made the above-referenced application, but the Board believes that it is not unreasonable to expect gaps in wireless communications coverage in an area with topography as unique as that of Ogunquit's.

*Id.* ¶ 22.

Article 6.6 of the Ordinance states that the "Planning Board shall approve, deny or approve with conditions all applications for special exceptions. The applicant shall have the burden of proving that its application is in compliance with the requirements of this Ordinance." Defendants' SMF ¶ 6; Plaintiff's Reply SMF ¶ 6. The Denial conceded that three of the four criteria set forth in Article 6.7(A), governing special exceptions, were satisfied by the Application; however, the Board stated that the Application did not meet section 6.7(A)(4), which requires that an application "be in conformance with and promote the general purposes and intent of the Ordinance." Plaintiff's SMF ¶ 57; Defendants' Reply SMF ¶ 57.[12] The purposes of the Ordinance are "to promote the general welfare of the Town, to protect the health of its inhabitants, to encourage the most appropriate use of land within the Town, to conserve the value of said land; further it is designed to fulfill all the purposes of zoning embraced in Maine Revised Statutes and the Town of Ogunquit Charter and Comprehensive Plan." *Id.* ¶ 58.

Section 9.16(A) of the Ordinance states:

Communications towers are permitted only in the Farm District. Communications antennas shall be permitted in the Farm District and by special exception in the zones indicated in Table 702.1 as an accessory use only and may be erected on or attached only to existing structures. The antenna and its associated equipment must be made to blend in with the existing structure to minimize its visual impact. In no case may an antenna in any district but the Farm District exceed the height of the building that [it] is mounted on or adjacent to. In the Farm District the height of an antenna shall be included in the total

---

12. The three special-exception criteria deemed satisfied by the Board were that (i) the application would not prevent the orderly and reasonable use of adjacent properties or of properties in adjacent use districts, (ii) the application would not prevent the orderly and reasonable use of permitted or legally established uses in the district wherein the proposed use was to be located or in adjacent districts, and (iii) the application would not adversely affect the safety, health and welfare of the Town. Plaintiff's SMF ¶ 57; Defendants' Reply SMF ¶ 57.

height limitation as allowed for a communications tower.

*Id.* ¶ 33.

Section 9.16(B) of the Ordinance provides:

> The placement of antennas and associated equipment onto an existing structure may be allowed in all districts indicated in Table 702.1 when they are designed to be incorporated into the architecture of new or existing buildings or into the fabric of other manmade or natural structures or features so as to be inconspicuous when viewed at any point beyond the limits of the host property. Where applicable the provisions of Article 11, Design Review, shall apply.

*Id.* ¶ 34. Table 702.1 of the Ordinance (titled Land Uses Permitted in Zoning Districts) lists wireless communications antennas as a commercial use permitted by special exception in the GBD1 District. *Id.* ¶ 35.

Section 2.0 of the Ordinance defines accessory use as "a use customarily incidental and subordinate to the principal building or use and located on the same lot with such principal building or use." *Id.* ¶ 38. The proposed Facility would be located on the same property as the Tower and would depend on it for the elevation necessary to receive or transmit radio signals to provide local coverage for wireless users. *Id.* ¶ 39. The equipment shed would house the regular and emergency power sources for the antennas—electrical service with a backup battery pack—as well as radio equipment for the antennas. *Id.* ¶ 42. The proposed Facility would require electric and tele-

phone service. *Id.* Co-location of wireless communications antennas on existing structures is a common practice. Plaintiff's SMF ¶ 40; Record, Tab 37, at 13. The only discussion of the equipment cabinet's status as an accessory use that is present in the Record is Board member Dello Russo's statement that the buildings would not be accessory to the HAM radio tower because they are not necessary to the HAM use and would be part of Sprint's use. Plaintiff's SMF ¶ 51; Defendants' Reply SMF ¶ 51.

Table 702.1 of the Ordinance prohibits wireless communications towers in all districts except the Farm District. *Id.* ¶ 41. The maximum height of a communications tower serving one carrier is 125 feet. Defendants' SMF ¶ 10; Plaintiff's Reply SMF ¶ 10. To fill the gap in Sprint's service to Route One, a tower in the Farm District would need to be taller than 125 feet. Plaintiff's SMF ¶ 41; Record, Tab 37, at 38.[13]

### III. Discussion

In its four-count complaint, Sprint asserts that the Denial (i) violated section 704 of the Federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c) (Count I), (ii) is vulnerable on direct administrative appeal pursuant to Me. R. Civ. P. 80B inasmuch as it was based on errors of law, violated the Ordinance, a state statute (30–A M.R.S.A. § 3012) and the United States and Maine constitutions, was not based on substantial evidence, constituted an abuse of discretion and was arbitrary and capricious (Count II); should be declared pursuant to the Declar-

---

**13.** Although, as the Defendants point out, Defendants' Reply SMF ¶ 41, Cooke does not expressly state that a tower in the Farm District would need to be taller than 125 feet, this is a fair import of his statement that a tower as high as 190 feet in that district still would not adequately cover Route One along

its north-to-south axis, Record, Tab 37, at 38. Section 9.16(C) of the Ordinance permits an increase of up to thirty-two feet in tower height for each additional company or carrier using a tower in the Farm District, up to a maximum of 190 feet. Record, Tab 29, at 85.

atory Judgment Act, 28 U.S.C. § 2201, to have violated the TCA, the due-process clauses of the United States and Maine constitutions, the commerce clause of the United States Constitution and 30–A M.R.S.A. § 3012 (Count III); and constituted a violation of the Civil Rights Act, 42 U.S.C. § 1983, on the basis of transgression of the TCA and of the due-process and commerce clauses of the United States Constitution. Complaint ¶¶ 40–74.

In addition to expedited review in this court, Sprint seeks (i) a declaration and judgment that the Board's action contravened the TCA, the due-process clauses of the United States and Maine constitutions, the commerce clause of the United States Constitution, 30–A M.R.S.A. § 3012 and 42 U.S.C. § 1983 and therefore is void and invalid; (ii) a declaration and judgment that the design-review criteria of the Ordinance are void for vagueness in violation of the due-process clauses of the United States and Maine constitutions and therefore are void and invalid; (iii) an order that the Town issue all appropriate permits and approvals for Sprint to proceed with the proposed Facility without further deliberation; and (iv) an award of Sprint's costs of suit, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988. *Id.* at 17.

Inasmuch as I find that the Board's action violated the TCA, I do not reach Sprint's constitutional bases for relief. *See El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 494 (1st Cir.1992) (noting, in context of request for declaratory judgment, "It has long been a basic tenet of the federal courts to eschew the decision of cases on constitutional grounds unless and until all other available avenues of resolution were exhausted.") (citation and internal quotation marks omitted).

## A. Violation of TCA: Effective Prohibition

Sprint argues as an initial matter that the Denial violated the TCA inasmuch as it effectively prohibited personal wireless service and was not based on substantial evidence. Plaintiff's Motion at 7. The TCA, which was enacted to "encourage the rapid deployment of new telecommunications technologies," *Reno v. American Civil Liberties Union,* 521 U.S. 844, 857, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (citation and internal quotation marks omitted), provides in relevant part:

**(A) General authority**

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

**(B) Limitations**

**(i)** The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

\* \* \* \* \* \*

**(II)** shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

\* \* \* \* \* \*

**(iii)** Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7).

The First Circuit has described section 332(c)(7) as "a deliberate compromise between two competing aims—to facilitate

nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." *Town of Amherst v. Omnipoint Communications Enters., Inc.,* 173 F.3d 9, 13 (1st Cir.1999) (footnote omitted).

 "[L]ocal zoning policies and decisions have the effect of prohibiting wireless communication services if they result in 'significant gaps' in the availability of wireless services [within the relevant jurisdiction]." *Cellular Tel. Co. v. Zoning Board,* 197 F.3d 64, 70 (3d Cir.1999). A service provider need not point to a general ban against communications towers to succeed in demonstrating that a zoning denial effectively prohibits personal wireless service; however, the provider must meet a "heavy" burden: "to show from language or circumstances not just that *this* application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Town of Amherst,* 173 F.3d at 14 (emphasis in original). "[I]n deciding whether a local government's zoning regulations or zoning decisions prohibit, or have the effect of prohibiting, the provision of personal wireless services, a court resolves the issue *de novo.*" *Omnipoint Communications MB Operations, LLC v. Town of Lincoln,* 107 F.Supp.2d 108, 116 (D.Mass.2000); *see also Southwestern Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 58 (1st Cir.2001) (same).

I find that Sprint meets the heavy burden of showing that the Board's decision in this case was tantamount to an effective prohibition of wireless services in the Town. While I decide this case on that basis, in the process of so doing I necessarily address, in part, certain other of Sprint's objections. These are that: (i) the decision in some respects is not based on substantial evidence (implicating both the TCA and the Rule 80B appeal portions

of the Complaint) and (ii) the Board misconstrues certain key sections of the Ordinance (implicating the 80B appeal).

In both the TCA and state-law contexts, "substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hrouda v. Town of Hollis,* 568 A.2d 824, 826 (Me.1990) (citations and internal quotation marks omitted); *accord Todd,* 244 F.3d at 58. "[T]he possibility of drawing two inconsistent conclusions does not mean that the zoning authority's decision is not supported by substantial evidence." *Town of Lincoln,* 107 F.Supp.2d at 115; *accord Forbes v. Town of Southwest Harbor,* 763 A.2d 1183, 1186 (Me. 2001). Nonetheless, mere "generalized concerns" regarding a proposed wireless facility have been held insufficient to constitute substantial evidence. *BellSouth Mobility Inc. v. Gwinnett County,* 944 F.Supp. 923, 928 (N.D.Ga.1996); *see also V.S.H. Realty, Inc. v. Gendron,* 338 A.2d 143, 145 (Me. 1975) (decision must be based on substantial evidence "rather than the visceral reactions of [an administrative agency's] members"). "This review, though highly deferential, is not a rubber stamp." *Todd,* 244 F.3d at 58–59 (citation and internal quotation marks omitted).

By contrast, "[s]tatutory construction is a matter of law, and decisions regarding the meaning of a statute are reviewed de novo." *Home Builders Ass'n of Maine, Inc. v. Town of Eliot,* 750 A.2d 566, 569 (Me.2000). The courts "look first to the plain meaning of the statutory language as a means of effecting the legislative intent." *Id.* (citation and internal quotation marks omitted). "Only if the statutory language is ambiguous will [the court] examine other indicia of legislative intent, such as legislative history." *Id.* (citation and internal quotation marks omitted). "The terms or expressions in an ordinance are to be con-

strued reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole." *Gerald v. Town of York,* 589 A.2d 1272, 1274 (Me.1991).

■ Sprint demonstrates the following relevant to effective-prohibition analysis:

1. The Town has no wireless communications tower or antennas.

2. There is no wireless service in downtown Ogunquit or the adjacent Route One corridor. Although there is a wireless facility in York, it does not serve those portions of Ogunquit. This constitutes a "significant gap." *See, e.g., Town of Lincoln,* 107 F.Supp.2d at 119 (holding that gap in service to large area of northwest section of town and portions of Routes 2 and 2A, which were heavily traveled, constituted "significant gap" for purposes of TCA; noting, "Since wireless services, unlike more traditional communications industries, are used while in transit, a gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac."); *compare, e.g., 360° Communications Co. of Charlottesville v. Board of Supervisors,* 211 F.3d 79, 87 (4th Cir.2000) ("The Act obviously cannot require that wireless services provide 100% coverage. In recognition of this reality, federal regulations contemplate the existence of dead spots, defined as 'small areas within a service area where the field strength is lower than the minimum level for reliable service.' ") (quoting 47 C.F.R. § 22.99).

3. The Town bans the construction of new wireless communications towers in all but one of its fourteen zoning districts, the Farm District. The construction of a tower as high as 125 feet in the Farm District—the maximum height permitted for a tower occupied by only one carrier—would not adequately fill the gap in coverage along Route One.

4. Although the Ordinance facially permits co-location of antennas on existing structures by special exception in certain zoning districts, including GBD1, the Board construes relevant Ordinance language in such a manner as to make it fruitless for Sprint, if not any commercial wireless services provider, to seek such approval. Section 9.16(A) of the Ordinance expressly states that communications antennas "shall be permitted in the Farm District and by special exception in [certain zones] as an accessory use only and may be erected on or attached only to existing structures." In turn, section 2.0 of the Ordinance defines an "accessory use" as "a use customarily incidental and subordinate to the principal building or use and located on the same lot with such principal building or use."

Section 9.16(A) presupposes that the co-location of a wireless communications facility can qualify as an "accessory use." Consistent with this logic, the record evidence shows that co-location of wireless antennas on existing structures is a common means of providing service coverage. Section 2.0, in turn, defines a use as "accessory" if it is customarily incidental or subordinate to either the principal building or the principal use. Although the use of the proposed antennas clearly would be incidental and subordinate to the HAM tower structure, the Board nonetheless erroneously inserts an "and" in place of an "or," insisting that a wireless use be incidental both to a preexisting use and to a preexisting structure.

The Board then reasons that "the twenty-four (24) hour a day, seven (7) day a week use of the proposed antennae would, in effect, become the new principal use of the structure and the ham radio operation would then become the accessory use." By this measure, it is difficult to imagine

any use to which the proposed Facility could qualify as accessory; certainly, no preexisting structure could be in use for a greater amount of time. *See Town of Amherst*, 173 F.3d at 14 ("If the [zoning] criteria or their administration effectively preclude towers no matter what the carrier does, they may amount to a ban 'in effect' even though substantial evidence will almost certainly exist for the denial.").

Likewise, although sections 9.16(A) and (B) of the Ordinance both contemplate the placement of an antenna and its "associated equipment," the Board erroneously concludes that Sprint's proposed equipment shed would not constitute an accessory to the current HAM use but rather an accessory to a proposed accessory use. In so doing, the Board misconstrues the Ordinance in such a way as to make it fruitless for Sprint to apply for a special exception to co-locate equipment. The record indicates, and the Ordinance acknowledges, that antennas require certain associated equipment to operate. Logically, the Ordinance can only be construed to regard the antenna and associated equipment together as an "accessory." Under the Board's interpretation, Sprint's proposed Facility could not qualify as an "accessory" inasmuch as it requires associated equipment that would be housed in a storage shed, and the housing would be deemed an unacceptable "accessory to an accessory." An ordinance should not be construed to create "absurd, inconsistent, unreasonable or illogical results." *Banks v. Maine RSA # 1*, 721 A.2d 655, 657 (Me.1998) (citation and internal quotation marks omitted).[14]

Moreover, the evidence of record reveals that the battery and radio equipment that would be housed in the proposed shed is crucial to operation of the antenna and thus constitutes an integral part of the antenna installation. The Board's finding that the shed is an "accessory" to the antenna use (versus an integral part of that "principal" use) is thus unsupported by substantial evidence.

5. Since 1997 Sprint has investigated at least ten possible sites to service the Ogunquit area. Sprint adduces expert evidence, including the opinions of Amidon, Cooke and Zareian, that for various reasons none of these sites save the Tower site proved feasible. Notably, in two instances, Sprint attempted to cooperate with the Town to situate a tower on alternative municipal sites, only to have the Town rebuff both attempts in April 1998. This evidence is uncontroverted by the Town. *See National Tower, LLC v. Frey*, 164 F.Supp.2d 185, 189 (D.Mass.2001) ("Although a local zoning board does not bear the burden of proving that a suitable alternative site in fact exists, Plainville has done nothing to controvert Omnipoint's showing to the contrary.") (citation omitted).

6. Although the Board insists that alternatives remain to Sprint—notably, co-location on an existing water tank or on a new tower to be built by the police department on the water-district property, that finding is unsupported by substantial evidence of record. The water-tank property is located in the Residential District, where co-location of wireless communications antennas is not permitted, even by special exception. Nothing in the record presented to me—apart from some Board members' visceral reactions—suggests

14. I recognize that members of the Board suggested that the proposed Facility could qualify as an accessory use in a different location (*i.e.,* if attached to the water tank or co-located on a tower to be developed by the police department); however, the Board could not do so consistent with the interpretations of sections 9.16(A) and (B) applied in the case of the Marton site.

that Sprint could overcome this obstacle. In addition, even if co-location were permitted on the water tank, Sprint adduces uncontroverted evidence that the site would not work from a technical standpoint.

7. To the extent the Town implies that the wireless-service coverage gap could be filled by the siting of numerous short towers, this suggestion, too, is unmoored by substantial record evidence. The only evidence presented that touches on this point is the Zareian testimony that (i) given Sprint's technology, such a configuration would cause serious quality problems, (ii) no installation nationwide has used a series of small PCS sites to provide full area coverage and (iii) expense alone would render such a grouping infeasible. For this reason, as well as the reasons discussed in Paragraphs 5 and 6 above, this case is distinguishable from *Town of Amherst,* in which the First Circuit found that a town had not effectively prohibited wireless services when a carrier had relied on a "one-proposal strategy" and had "practically admitted that *somewhat* lower towers were technically feasible." *Town of Amherst,* 173 F.3d at 15 (emphasis in original). The Town having identified only seemingly infeasible alternatives, it failed to afford Sprint "the kinds of clues that might instruct a petitioner in the ways it might satisfy a Town's legitimate objections." *Cellco Partnership v. Town of Douglas,* 81 F.Supp.2d 170, 175 (D.Mass.1999) (footnote omitted).

8. Certain comments by Board members not only convey a tone of hostility toward use of the Marton site for a wireless facility (*i.e.,* Hokans' comment at the outset that the Board had enough evidence to turn the Application down cold) but also evince indifference toward a gap in cover-

age that I have determined qualifies, as a matter of law, as significant (*i.e.,* the Board's ninth official reason for denial, conveying its belief "that it is not unreasonable to expect gaps in wireless communications coverage in an area with topography as unique as that of Ogunquit's").

I am satisfied that, in this case, the combination of the above factors demonstrates that "further reasonable efforts [to provide wireless service in the Town of Ogunquit] are so likely to be fruitless that it is a waste of time even to try." *Town of Amherst,* 173 F.3d at 14. I therefore find that the Town effectively prohibits wireless services in contravention of section 332(c)(7) of the TCA. Sprint accordingly is entitled to the injunctive relief it requests. *See, e.g., Brehmer v. Planning Board,* 238 F.3d 117, 121–22 (1st Cir.2001) (award of injunctive relief, rather than remand, appropriate remedy for violation of TCA); *Patterson v. Omnipoint Communications, Inc.,* 122 F.Supp.2d 222, 227 (D.Mass.2000) ("The rationale sustaining this injunctive relief is to stop local authorities from keeping wireless providers tied up in the hearing process, as that would frustrate the TCA's clear mandate to expeditiously review and remedy TCA violations.") (citations and internal quotation marks omitted).

## B. Applicability of 42 U.S.C. § 1983 to TCA Claim

■■■■ One additional issue remains to be addressed: whether the TCA claim properly is subsumed under the umbrella of the Civil Rights Act, 42 U.S.C. § 1983.[15] A plaintiff seeking redress pursuant to section 1983 "must assert the violation of a federal *right,* not merely a violation of federal *law." Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d

---

**15.** Sprint seeks attorneys' fees pursuant to 42 U.S.C. § 1988, the award of which is predi-

cated on violation of 42 U.S.C. § 1983. See Complaint at 17.

569 (1997) (emphasis in original). If a plaintiff succeeds in so doing, a rebuttable presumption arises that the right is enforceable pursuant to section 1983. *Id.* at 341, 117 S.Ct. 1353. That presumption may be rebutted by showing that Congress either expressly foreclosed a section 1983 remedy or did so impliedly through creation of "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* Courts should not "lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. City of Roanoke,* 479 U.S. 418, 423–24, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (citation and internal quotation marks omitted).

The TCA enforcement scheme in issue consists in relevant part of the following:

> Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis . . . .

47 U.S.C. § 332(c)(7)(B)(v).

The First Circuit has yet to consider the question whether a violation of section 332(c)(7) of the TCA is redressable pursuant to section 1983. My research reveals that only one federal circuit court of appeals, that for the Eleventh Circuit, has addressed the issue, concluding that such a cause of action is cognizable pursuant to section 1983; however, the court vacated this opinion pending rehearing *en banc* and the parties subsequently stipulated to

dismissal of the appeal. *See AT & T Wireless PCS, Inc. v. City of Atlanta,* 210 F.3d 1322 (11th Cir.2000), *vacated pending reh'g en banc,* 260 F.3d 1320 (11th Cir.), *and appeal dismissed per stipulation,* 264 F.3d 1314 (11th Cir.2001).

Nonetheless, the question has been pondered by several federal district courts, which have concluded with little difficulty both that a cause of action pursuant to section 332(c)(7) of the TCA constitutes a "federal right" for purposes of the *Blessing* analysis and that the TCA does not expressly foreclose a section 1983 remedy. *See, e.g., SBA Communications, Inc. v. Zoning Comm'n,* 164 F.Supp.2d 280, 295 (D.Conn.2001); *Omnipoint Communications, Inc. v. Penn Forest Township,* 42 F.Supp.2d 493, 502–04 (M.D.Pa.1999).[16]

Nonetheless, as the Defendants note, there is a split of authority on the remaining query: whether section 332(c)(7) contains a sufficiently comprehensive enforcement mechanism to impliedly foreclose a section 1983 remedy. Defendants' Motion at 37–38; *compare, e.g., National Telecomm. Advisors, Inc. v. City of Chicopee,* 16 F.Supp.2d 117, 122–23 (D.Mass.1998) (Ponsor, J.) (finding section 1983 action impliedly foreclosed), *with Sprint Spectrum, L.P. v. Town of Easton,* 982 F.Supp. 47, 53 (D.Mass.1997) (Tauro, C.J.) (permitting section 1983 action).

As Sprint observes, a majority of courts have held that the section 332(c)(7) remedy is not sufficiently comprehensive to imply preclusion of a cause of action pursuant to section 1983. *See* Plaintiff's Reply Memorandum in Support of Motion for Judgment on the Stipulated Record (Docket No. 14) at 16–17; *see also, e.g., Penn For-*

---

**16.** *Verizon North, Inc. v. Strand,* 140 F.Supp.2d 803, 812 (W.D.Mich.2000), which the Defendants cite for the proposition that section 332(c)(7) of the TCA does not confer a

"federal right," Defendants' Motion at 36–37, is distinguishable inasmuch as it concerns an unrelated section of the TCA.

*est,* 42 F.Supp.2d at 504. I nonetheless accept the Defendants' invitation to follow *City of Chicopee, see* Defendants' Motion at 37–39, inasmuch as I find its reasoning consonant with relevant Supreme Court and First Circuit precedent.

The court in *City of Chicopee* held in essence that analysis of whether Congress has impliedly ousted a section 1983 action turns on the completeness, rather than the complexity, of the remedy already afforded. *City of Chicopee,* 16 F.Supp.2d at 121–22. The court found the terse section 332(c)(7) remedy sufficiently "comprehensive" inasmuch as, *inter alia,* "the statute provides a clear, detailed process that allows quick and complete remedies for individuals improperly denied permission to erect a personal wireless communication tower" and "the § 1983 statutory apparatus adds *nothing* to plaintiff's remedial armament under the TCA—except the opportunity to seek attorney's fees under § 1988." *Id.* at 122 (emphasis in original). As to this latter point, the court further observed, "Given that litigation under the TCA will inevitably be directed, from time to time, at relatively unsophisticated, small or remote townships, the absence of any provision for fees in the TCA is telling." *Id.*

The *City of Chicopee* court's reasoning appears consistent with a key distinction drawn by the Supreme Court between the remedial scheme at issue in *Blessing,* which the Court held did not preclude recourse to section 1983, and those at issue in *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), which the Court held did: "The enforcement scheme

that Congress created in Title IV–D [of the Social Security Act] is far more limited than those in *Sea Clammers* and *Smith.* Unlike the federal programs at issue in those cases. Title IV–D contains no private remedy—either judicial or administrative—through which aggrieved persons can seek redress." *Blessing,* 520 U.S. at 348, 117 S.Ct. 1353.

In like vein, the First Circuit has reasoned in holding that the Cable Act did not foreclose a section 1983 remedy:

> Most importantly, none of these [Cable Act] provisions affords a remedy against state actors (other than the franchise authority) who might encroach on rights guaranteed by the Cable Act, because the Cable Act's remedies are aimed either at private conduct regulated by the Act, or at the cable franchise authority. For certain, a statute's express remedies need not be as comprehensive or efficient as § 1983 in order to evince an intent to preclude use of § 1983. Yet, it seems clear that before one can conclude that Congress meant to displace a § 1983 suit with a particular remedial scheme, that scheme must at least serve to protect the federal right created in the statute and at issue in the case.

*Playboy Enters., Inc. v. Public Serv. Comm'n,* 906 F.2d 25, 33 (1st Cir.1990) (citations omitted).

For these reasons, I conclude that the TCA affords Sprint no remedy pursuant to section 1983.[17]

## IV. Conclusion

For the foregoing reasons, the Plaintiff's Motion is **GRANTED** with respect to its argument that the Denial violated the TCA and is otherwise **DENIED,** and the Defendants' Motion is **GRANTED** with respect

---

**17.** I do not address Sprint's arguments that it may alternatively pursue a section 1983 remedy pursuant to its constitutional claims, Plain-

tiff's Motion at 37–39, inasmuch as I do not reach the substance of those claims.

to the availability to Sprint of a section 1983 action pursuant to the TCA and is otherwise **DENIED;** and it is hereby:

(i) **DECLARED** and **ADJUDGED** that the Board's action contravened the TCA and therefore is void and invalid; and

(ii) **ORDERED** that the Town issue all appropriate permits and approvals for Sprint to proceed with the proposed Facility without further deliberation.