**TOWN OF AMHERST, NEW HAMPSHIRE, Defendant, Appellant,**

v.

**OMNIPOINT COMMUNICATIONS ENTERPRISES, INC., Plaintiff, Appellee.**

No. 98–2061.

United States Court of Appeals, First Circuit.

Heard March 1, 1999.

Decided March 30, 1999.

Before BOUDIN, Circuit Judge,
BOWNES, Senior Circuit Judge, and
LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

This is an appeal by the Town of Amherst, New Hampshire, from an injunction granted by the district court. The injunction, granted on cross-motions for summary judgment, directed the town to grant permits to Omnipoint Communications Enterprises, Inc. ("Omnipoint"), to build facilities to provide wireless telephone services. The case presents difficult issues under the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.* The background events are generally undisputed.

Omnipoint is a major provider of wireless telephone service to the public. In March 1997 or thereabouts, Omnipoint began designing a wireless digital system for southern New Hampshire.[1] In that same month, the Town of Amherst adopted at the town meeting an ordinance governing the placement of wireless communications facilities in the town. *See* Amherst, N.H., Ordinance (Mar. 11, 1997) ("the March 1997 ordinance"). The town meeting also authorized the town Board of Selectmen ("the Selectmen") to make agreements with carriers to site towers on town properties. Under New Hampshire law, the town meeting legislates for the town and the Selectmen are the principal executive body. *See* N.H.Rev.Stat. Ann. § 672 *et seq.*

For zoning purposes, Amherst is divided into 13 districts. The March 1997 ordinance prohibits siting of the towers in four of the districts, although those prohibitions may be overcome if a variance is obtained. In four other districts, towers are allowed only through the grant of a "special exception"; the conditions for such a special

---

Robert D. Ciandella with whom Philip L. Pettis and Donahue, Tucker & Ciandella were on brief for appellant.

Steven E. Grill with whom Daniel E. Will and Devine, Millimet & Branch, P.C. were on brief for appellee.

1. Although often called "cellular" telephone service, several different technologies compete. Omnipoint uses a high frequency, digital system called personal communication service, or "PCS." Almost all systems employ hand-held telephone sets communicating by radio with antennas strategically located on towers or buildings; each antenna is connected eventually to the land-line telephone network.

exception are set out in the ordinance.[2] The ordinance also imposes setback requirements for towers in the "allowed" districts, requiring towers to be set back at least 500 feet from Route 101, set back twice the tower height from residential property lines, and set back a distance equivalent to the tower height from all other roads and certain other prescribed areas. *See* March 1997 ordinance.

In April 1997, the Amherst Selectmen began negotiating with Omnipoint and also advertised to solicit interest from other carriers who might wish to locate a system in Amherst. Omnipoint then designed a system comprising four 190–foot towers— tall enough to allow co-location of antennas by up to four other providers who might compete with Omnipoint. Towers are very expensive, often costing $500,000 or so each; co-location increases tower height but reduces the number of towers and greatly reduces overall costs because fewer towers are needed and because a tower's cost does not increase proportionately with height.

In late April 1997, the Federal Communications Commission granted Omnipoint a non-exclusive license to provide wireless digital telephone service in New England, including southern New Hampshire. Under the license, Omnipoint must make service available to 25 percent of the population in the region within five years and 50 percent within ten years. Omnipoint wants to provide service not only within the town of Amherst but also for transients who are using Route 101, an important travel route in southern New Hampshire that traverses Amherst, running roughly from northeast to southwest.

Omnipoint and the Selectmen reached agreement in August 1997 and signed leases for three town-owned sites along Route 101; on each, Omnipoint proposed to con- struct a 190–foot tower. It was also agreed that the town would receive a portion of revenue from Omnipoint and any other providers co-locating on the towers constructed on town-owned land. The Selectmen wrote a letter endorsing the proposed towers to the Amherst Zoning Board of Adjustment ("the Board"), a separate local body that regulates zoning matters. *See* N.H.Rev.Stat. Ann. § 674:33. The leases made clear that the responsibility to procure Board approval rested on Omnipoint's shoulders.

Starting in the northeast, the first tower was to be sited near the northern entrance to the town on the so-called Bragdon Farm site owned by the town. Construction of this tower required a special exception under the Amherst ordinance and two variances from the setback restrictions from the Board; no use variance was required. This was also true of the second site on which a town-owned recycling center was located. Under state law, variances require a showing of hardship. *See* note 6, below.

The third tower site agreed to by the Selectmen—clearly the most controversial—was a town-owned "public safety" complex where a somewhat shorter tower already exists for wireless communication by the police and fire department. Omnipoint proposed to construct a 190–foot tower that could also be used by the police and fire department. However, this area is denominated a historic district and siting towers in such a district is prohibited under the town's March 1997 zoning ordinance absent a use variance. Thus, Omnipoint required a use variance, a setback variance, and a separate permit from the Historic District Commission, another local body.

Omnipoint also reached agreement with a church to locate a fourth tower on church

---

2. Under state law, the terms of the ordinance and its self-described purposes establish the test for special exceptions. *See* N.H.Rev.Stat. Ann. § 674:33. The specific purpose of the Amherst ordinance is "[t]o prevent the devel- opment of a proposed facility in areas that are unsatisfactory and will interfere with the view from any public land, natural scenic vista, historic building or district or major view corridor." March 1997 ordinance.

land near Route 101. The fourth site was in a district where a tower could be constructed with a special exception and, in this case, with one setback variance. This area, located to the south of the other proposed sites, lay just north of the main population center in Amherst. Omnipoint also applied for and secured a single site in the southern area of the town—where neither special exception nor variance was required and neither, therefore, was Board approval. There is no indication that service for Amherst can be provided using this single tower.

In early September 1997, Omnipoint applied to the Board for the required special exceptions and variances on all four sites. It also applied to the Historic District Commission for approval to construct on the site located at the safety complex. On September 16, 1997, Omnipoint made a presentation before the Board, which received public comment and then deferred matters until October. The Board's minutes summarize such oral presentations but no transcript exists. Two days later, the Historic District Commission met in public session and denied Omnipoint's application, apparently in Omnipoint's absence.

Omnipoint immediately appealed the Commission's decision to the Zoning Board of Adjustment, which can override the Historic District Commission. On October 21, 1997, the Zoning Board met again. Omnipoint provided additional information and answered more questions from the Board, and public comments were again taken. The hearing was continued until November 1997, when the same process was repeated. The Board then deferred decision until December 1997, saying that there would be no more presentations or public testimony. At all of these meetings, a number of residents questioned or opposed the project, citing primarily concerns about visual blight and impairment of property values.

On December 8, 1997, Omnipoint filed the present lawsuit against the town asserting that Amherst's delay violated the Telecommunications Act of 1996. Under this statute, the FCC licenses carriers to provide wireless telephone service on a competitive basis. 47 U.S.C. § 332(c). Rate regulation by states is precluded, unless special circumstances are shown. *See id.* § 332(c)(3). However, the statute preserves state and local authority over the placement and construction of facilities, *id.* § 332(c)(7)(A), subject to five limitations, *id.* § 332(c)(7)(B).

The first limitation, contained in subsection (i) and central to this case, includes two substantive constraints:

(i) the regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit *or have the effect of prohibiting* the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(B)(i) (emphasis added). Amherst does not dispute that Omnipoint's service is a "personal wireless service." *Id.* § 332(7)(c).

Three of the four remaining limitations are pertinent here: the local government must act on placement or construction applications "within a reasonable period of time"; the denial of a request "shall be in writing and supported by substantial evidence contained in a written record"; and anyone adversely affected by any final action "or failure to act" by local government that is inconsistent with the limitations may seek review in "any court of competent jurisdiction" and "[t]he court shall hear and decide such action on an expedited basis." 47 U.S.C. §§ 332(c)(7)(B)(ii), (iii), (v).

On December 16, 1997, eight days after the lawsuit was filed, the Zoning Board of Adjustment met and unanimously denied all of Omnipoint's applications for special

exceptions and variances and also denied its appeal from the decision of Historic District Commission. In early January 1998, Omnipoint amended its district court complaint to challenge the denials and also requested the Board to reconsider its decisions. Shortly thereafter, Omnipoint moved for summary judgment in the district court.

In response to Omnipoint's request for reconsideration, the Board held a new hearing in February 1998. Omnipoint offered no new evidence, but the Board heard additional public comment. On March 16, 1998, the Board issued a further decision, denying Omnipoint's request for reconsideration and issuing a more extensive decision. The Board expressed general concerns about tower height and the impact on town character and property values, and then explained one by one—albeit in boilerplate language—why the individual variances or special exceptions sought did not meet specific requirements of state law or the March 1997 ordinance. For example, in rejecting Omnipoint's request for a setback variance at the Bragdon Farm site, the Board stated in its "findings of fact" simply that "[t]he proposed tower does not meet the spirit and intent of the Amherst Master Plan to maintain the rural character of the northern entrance to the Town."

Later, after Omnipoint further amended its complaint, Amherst cross-moved for summary judgment. In July 1998, a hearing was held in the district court on the cross-motions. Within six weeks, the district court issued a 47-page memorandum opinion analyzing the issues in detail and concluding that the town had violated the requirement that the local regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(7)(B)(i)(II); *see Omnipoint Communications Enters., Inc. v. Town of Amherst,* No. 97–614–JD (D.N.H. filed Aug. 21, 1998). The district court rejected Omnipoint's claim that the Board had unreasonably delayed decision, and it did not resolve the question of whether the denial was based on substantial evidence. *Id.*

In finding an effective prohibition, the district court stressed that the Board's denial rested on very general standards and did not give any indication as to how the plaintiffs could overcome the "amorphous concerns" expressed or offer any guidance as to where towers could be located to construct a functioning system. The court concluded that a mandatory injunction would issue directing the town to issue the necessary permits within 45 days. We stayed the district court's injunction pending an expedited appeal. On this appeal, we review the grant of summary judgment in favor of Omnipoint *de novo,* drawing inferences in favor of the town. *See Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994).

 The statutory provision before us, 47 U.S.C. § 332(c)(7), is a deliberate compromise between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.[3] There are already two circuit decisions and several dozen district court decisions addressed to one or more of the half-dozen recurring issues under the statute. One of those issues, and the ground for the district court's injunction in this case, is Congress' mandate that no "regulation" of siting is permitted that has "the effect of prohibiting" service. 47 U.S.C. § 332(c)(7)(B)(i)(II).

---

**3.** An initial House version of this provision required the formation of an FCC rulemaking committee charged with developing a uniform national policy for the deployment of wireless communication towers. The bill as it emerged from conference committee rejected such a blanket preemption of local land use authority, but retained specific limitations on local authority now reflected in the statute itself. *See* H.R. Conf. Rep. No. 104–458, at 207–09 (1996).

On appeal, the town argues that this "effect" provision was never intended to constrain individual town-permitting decisions but was directed only against "general" bans, whether explicit or implicit. There is some nominal conflict in the case law on this point,[4] but the quarrel is more one of language than substance. Obviously, an individual denial is not automatically a forbidden prohibition violating the "effects" provision. But neither can we rule out the possibility that—based on language or circumstances—some individual decisions could be shown to reflect, or represent, an effective prohibition on personal wireless service.

Suppose, for example, that in denying an individual permit, the town zoning authority announces that no towers will ever be allowed or sets out criteria that no one could meet. The fact that the ban is embodied in an individual decision does not immunize it. It is no answer to point to the requirement that individual decisions be based on "substantial evidence," for this surely refers to the need for substantial evidence *under the criteria laid down by the zoning law itself* (*e.g.*, for setbacks, conditions for variances, special exception requirements). *See, e.g., Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494–97 (2d Cir.1999).

If the criteria or their administration effectively preclude towers no matter what the carrier does, they may amount to a ban "in effect" even though substantial evidence will almost certainly exist for the denial. *See Virginia Metronet, Inc. v. Board of Supervisors*, 984 F.Supp. 966, 970 (E.D.Va.1998). In that event, the regulation is unlawful under the statute's "effect" provision. But the burden for the carrier invoking this provision is a heavy one: to show from language or circumstances not just that *this* application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try.

In this case, Amherst has not formally banned towers, *compare Sprint Spectrum, L.P. v. City of Medina*, 924 F.Supp. 1036, 1038–39 (W.D.Wash.1996), but rather required prior permission case by case. And on this record, there is no showing of such fixed hostility by the Board that one can conclude that further applications would be useless. While some of the Amherst citizens who testified evidently oppose any system in the town, several board members stressed that their concern was primarily with the 190–foot size and that negotiations with Omnipoint would be welcome. If these statements were mere camouflage, this has yet to be shown.

Were Omnipoint's existing proposal the only feasible plan, then prohibiting its plan might amount to prohibiting personal wireless service. However, what the record shows on this point, and we have read it end to end, can be summarized as follows. It appears that Omnipoint has proposed a traditional efficient system that uses standard height towers at optimal locations, minimizing both the total number of towers needed for service and the overall cost for itself and for other carriers that may wish to co-locate. Three of the sites have the added advantage of generating revenue for the town and upgrading fire and police communications.

But it also appears that lower towers could be used (and possibly resited) if co-location were sacrificed and more (perhaps many more) towers were added.[5] At this

---

**4.** *Compare AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 428–29 (4th Cir.1998), *and National Telecomm. Advisors, LLC v. Board of Selectmen of West Stockbridge*, 27 F.Supp.2d 284, 287–88 (D.Mass.1998), *with PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052, 1062–66 (N.D.Ill.1998), *and*

*OPM–USA–Inc. v. Board of County Comm'rs*, 7 F.Supp.2d 1316, 1327 (M.D. Fla.1997).

**5.** If lower towers were used, quite possibly more towers could be needed for Omnipoint alone but unquestionably shorter towers would lessen or eliminate the possibility of co-location for other carriers who, absent co-

point, certainty dissolves. At the town meeting, opponents offered some "evidence" that a feasible system could be constructed of very short towers, possibly disguised as trees. Omnipoint strongly disputed such claims—which may well be fantasy—but it practically admitted that *somewhat* lower towers were technically feasible. Nor is it clear that locating a tower within the historic district is technically essential.

Ultimately, we are in the realm of trade-offs: on one side are the opportunity for the carrier to save costs, pay more to the town, and reduce the number of towers; on the other are more costs, more towers, but possibly less offensive sites and somewhat shorter towers. Omnipoint may think that even from an aesthetic standpoint, its solution is best. But·subject to an outer limit, such choices are just what Congress has reserved to the town. *See AT & T Wireless PCS, Inc.*, 155 F.3d at 428–29. We need not decide now whether and to what extent legitimate zoning requirements could require a carrier to accept a wireless system that is functional but offers less than perfect performance.

Omnipoint did not present serious alternatives to the town. As it explained to the Board, it bowed to the Selectmen's wishes to use town sites and to maximize the opportunities for co-location. Further, detailed site planning is quite expensive, leases or options take time to procure, and even one set of variance and special exception requests is costly and time consuming. This one-proposal strategy may have been a sound business gamble, but it does not prove that the town has in effect banned personal wireless communication.

■ Omnipoint's stronger claim under the "effect" provision is that even if it might propose other solutions, none has any real prospect of success before the Board because no applicant can satisfy local requirements. In a nutshell, the Amherst ordinance seemingly requires some form of permission (special exception, variance or otherwise) for any system; the requirements for a variance under state law can be made very severe by insisting that no alternative reasonable use for the land exist;[6] and special exceptions under the Amherst ordinance have conditions so broad and general that a hostile Board might be able to find substantial evidence for every negative ruling. *See* note 2, above.

The concern should not be overstated, since special exceptions are a matter of right where the conditions are met, and the state courts are available to review the denial of any special exception or variance. Still, Omnipoint's claim is not frivolous. Possibly it would have a difficult time showing conclusively that there is no other use for the sites (allegedly the requirement for a use variance) or that the towers are completely compatible with the rural image that the town seeks to foster (allegedly an element in the special exception regime). The rather mechanical application of these concepts by the Board in its March 1998 decision lends support to this concern, and the district court's own decision rested largely on the view that the Board could and likely would reject alternative proposals.

■ Our own appraisal, which is *de novo* on summary judgment, is more ag-

---

location, might all need to build their own towers. According to Omnipoint, about 80 feet of the 190 feet represent height added to co-locate up to four more carriers.

6. Under New Hampshire law, a variance may be denied absent a showing of "unnecessary hardship," N.H.Rev.Stat. Ann. § 674:33, and hardship is sometimes equated with a showing that applying the zoning ordinance would prevent the applicant from making "any rea-

sonable use" of the property as zoned. *Olszak v. Town of New Hampton,*139 N.H. 723, 661 A.2d 768, 771 (1995). Yet, the "reasonable use" is itself a matter of degree, and New Hampshire case law suggests that the determination depends heavily on the particular facts. *See* P. Loughlin, 15 New Hampshire Practice: Land Use Planning and Zoning §§ 24.13–24.16, at 275–88 (2d ed.1993) (summarizing cases).

nostic. The very breadth and vagueness of the criteria that permit the Board to deny requests also give the Board some flexibility in deciding whether to grant them. Equally important, the strictures of New Hampshire and Amherst law are preempted, under the Supremacy Clause of the Constitution, if they are read and applied so as effectively to preclude personal wireless service. *See* H.R. Conf. Rep. No. 104–458, *supra,* at 207–08 (affirming "preemption" in the "limited circumstances" described in the provision). The minutes reflect that the Board more or less understands this, and so would the New Hampshire state courts. *Wenners v. Great State Beverages, Inc.,* 140 N.H. 100, 663 A.2d 623, 625–26 (1995), *cert. denied,* 516 U.S. 1119, 116 S.Ct. 926, 133 L.Ed.2d 854 (1996).

In all events, at least on the summary judgment record, it has not been shown that the Board will inevitably reject an alternative Omnipoint proposal with lower towers. Indeed, conceivably Omnipoint could offer such an alternative with lower towers and yet persuade the Board that, given the consequences (more towers) and perhaps modest height reduction, the Board is best off approving Omnipoint's original proposal or some close variant (*e.g.,* shifting one tower outside the historic district). It is too early to give up on the Board.

■ Below, Omnipoint pressed an alternative ground that the district court did not reach, namely, a claim that the Board's actions were unsupported by substantial evidence. 47 U.S.C. § 332(c)(7)(B)(iii). Something should be said about this claim in the interests of expedition since Omnipoint remains free on remand to renew its request for summary judgment on this issue. The substantial evidence question would ordinarily be resolved (one way or

the other) on the record before the district court and require no trial.[7]

As already noted, the substantial evidence requirement is centrally directed to those rulings that the Board is expected to make under state law and local ordinance in deciding on variances, special exceptions and the like. In a number of cases, courts have overturned denials of permits, finding (for example) that safety concerns and aesthetic objections rested upon hollow generalities and empty records. *See, e.g., Iowa Wireless Servs., L.P. v. City of Moline,* 29 F.Supp.2d 915, 921–23 (C.D.Ill. 1998); *AT&T Wireless PCS, Inc. v. City of Chamblee,* 10 F.Supp.2d 1326, 1331–33 (N.D.Ga.1997). The substantial evidence test, which we have recently described in some detail, involves some deference but also has some bite. *See Penobscot Air Servs., Ltd. v. FAA,* 164 F.3d 713, 718 (1st Cir.1999).

Still, in *this* case Omnipoint's prospects of success on this ground may be limited. The substantial evidence test applies to the locality's own zoning requirements, and Amherst has framed those requirements so they may be hard to fulfill unless the Board exercises its judgment favorably to the applicant. But this in turn makes Amherst more vulnerable to a claim, based on experience, that its regime is an effective ban. Thus, the two federal limitations—one dealing with bans and the other with substantial evidence—complement one another by ensuring that local law is both fair and is fairly administered.

Before any further litigation, Omnipoint might find it prudent to discuss with the Board an amicable resolution or an agreed upon procedure to achieve one. The Board must also face reality. If the Board's position is that it can just sit back and deny all applications, that position in

---

7. In considering whether substantial evidence supports the agency decision, the court is acting primarily in a familiar "review" capacity ordinarily based on the existing record. *See* H.R. Conf. Rep. No. 104–458, *supra,* at 208. By contrast, whether the town has dis-criminated among carriers or created a general ban involves federal limitations on state authority, presenting issues that the district court would resolve *de novo* and for which outside evidence may be essential. *See AT & T Wireless PCS,* 155 F.3d at 426–28.

the end could, if maintained, prove fatal to the Board rather than Omnipoint. Under federal law, the town can control the siting of facilities but—as several Board members admitted—it cannot preclude wireless service altogether. Nor, in the face of a vigilant district court, can the town exhaust applicants by requiring successive applications without giving any clue of what will do the trick.[8] Thus, it is in the common interest of the Board and Omnipoint to find ways to permit the siting of towers in a way most congenial to local zoning.

The statute's balance of local autonomy subject to federal limitations does not offer a single "cookie cutter" solution for diverse local situations, and it imposes an unusual burden on the courts. But Congress conceived that this course would produce (albeit at some cost and delay for the carriers) individual solutions best adapted to the needs and desires of particular communities. If this refreshing experiment in federalism does not work, Congress can always alter the law.

The district court's judgment is *vacated* and the matter *remanded* for further proceedings consistent with this opinion. Each side shall bear its own costs on this appeal.

*It is so ordered.*

---

8. While prepared to tolerate some delay, Congress made clear in two different provisions that it expected expeditious resolution both by the local authorities and by courts called upon to enforce the federal limitations. *See* 47 U.S.C. §§ 332(c)(7)(B)(ii), 332(c)(7)(B)(V); *see also* H.R. Conf. Rep. No. 104–458, *supra,* at 209.