ATC Realty v. Sutton, et al.          CV-01-046-M   03/07/02
                    UNITED STATES DISTRICT COURT

                     DISTRICT OF NEW HAMPSHIRE


ATC Realty, LLC and
SBA Towers, Inc.,
     Plaintiffs

     v.                                  Civil No. 01-046-M
                                         Opinion No. 2002 DNH 057
Town of Sutton, New Hampshire,
     Defendant


                         **O R D E R**


     ATC Realty, LLC ("ATC") and SBA Towers, Inc. ("SBA") have

sued the Town of Sutton ("the Town") in three counts, asserting

violations of 47 U.S.C. § 332(c)(7)(B)(iii) (Count I), 47 U.S.C.

§ 332(c)(7)(B)(i)(II) (Count II), and N.H. REV. STAT. ANN. ("RSA")

§ 677:4 (Count III), all of which arise from the Sutton Zoning

Board of Adjustment's denial of a special exception for the

construction of a 190-foot telecommunications tower on a parcel

of real estate on Southfield Road.  Before the court are cross-

motions for summary judgment.  For the reasons given below: (1)

plaintiffs' motion for summary judgment is granted as to Count I;

(2) the Town's motion for summary judgment is granted as to Count

II; and (3) Count III is deemed moot.

## Summary Judgment Standard

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trialworthy issue as to any material fact." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001) (citing Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 14 (1st Cir. 2000)). When ruling on cross-motions for summary judgment, the court "makes rulings of law – rulings concerning whether, once all reasonable inferences are drawn against granting summary judgment, there exists any 'genuine issue of material fact' as to which a trial is warranted." Continental Grain Co. v. Puerto Rico Maritime Shipping Auth., 972 F.2d 426, 429 (1st Cir. 1992) (emphasis in the original) (citations omitted).

> Not every factual dispute is sufficient to thwart
> summary judgment; the contested fact must be "material"
> and the dispute over it must be "genuine." In this
> regard, "material" means that a contested fact has the
> potential to change the outcome of the suit under the

governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

**Factual Background**

ATC and SBA (collectively "plaintiffs") develop networks for personal wireless services ("PWS"). Their work typically involves the construction and management of telecommunications towers for PWS providers, such as Nextel Communications, Sprint Spectrum PCS, Omnipoint Communications, AT&T, United States Cellular, and Star Cellular, each of which operates under a license issued by the Federal Communications Commission. Those licenses grant various rights and impose various obligations with respect to the services that may, and must, be provided to PWS customers. Based upon their identification of a service gap along the Interstate 89 corridor in the Town of Sutton, plaintiffs selected a location for the installation of a 190-foot tower, obtained a lease from the owner, and then sought approval

3

from the Town to construct it.  Specifically, plaintiffs applied for a special exception from the Sutton Zoning Board of Adjustment ("ZBA").

According to Article III, Section O, of the Sutton Zoning Ordinance ("SZO"), telecommunications facilities are subject to the following requirements:

    (a)    Facilities shall be sited and designed to minimize the visual impact on nearby residences, highways and roads and recreation areas;

    (b)    Siting of facilities shall be encouraged in the I-89 highway corridor; and

    (c)    New facilities are not permitted on the following scenic places: Meetinghouse Hill, Dresser Hills, Rowell Hill, Green Hill, Dodge Hill; and

    (d)    Planning and design for new wireless telecommunications facilities shall utilize existing towers as priority sites for the proposed antenna devices, where feasible.

(Pls.' Mem. of Law at 2-3; Def.'s Mem. of Law at 1.)  Under Article III, Section P of the SZO, a special exception is required before any structure with a height greater than thirty-five feet may be erected.  (Pls.' Mem. of Law at 4; Def.'s Mem.

4

of Law at 1.)  As for the criteria governing the granting of a

special exception:

> No special exception from the requirements of the Zoning Ordinance shall be authorized by the Board of Adjustment unless it finds that the following facts and conditions exist:
>
> a.   The site is an appropriate location for the use or structure.
>
> b.   The use will not be detrimental, injurious, noxious or offensive to the neighborhood.
>
> c.   There will be no undue nuisance or serious hazard to vehicular or pedestrian traffic.
>
> d.   Adequate and appropriate facilities will be provided to ensure the proper operation of the proposed use or structure.
>
> e.   The proposed use or structure is consistent with the spirit of this ordinance.

(Pls.' Mot. Summ. J., Ex. 2 (SZO, Art. VI, § A.2).)

By letter dated July 14, 2000 (Record of the Town of Sutton

Zoning Board of Adjustment (hereinafter "R.") at 01), ATC and SBA

filed an application for a special exception with the ZBA (R. at

02).  In that application, plaintiffs sought approval to

construct a "190' MULTI - tenant wireless telecommunications

tower on a 100' by 100' leased parcel within the [105-acre,

5

wooded] host parcel." (R. at 3.) According to plaintiffs, the proposed tower was designed to accommodate equipment for Sprint PCS, as well as other licensed PWS providers that might need to place or upgrade equipment in the Town of Sutton. (Id.)

The ZBA held a public hearing on plaintiffs' application on August 30, 2000 (R. at 64), which was continued to September 27, 2000 (R. at 82). A second public hearing was begun on October 25, 2000 (R. at 94), and continued to November 29, 2000 (R. at 194).

During the two public hearings, a number of issues were raised and considered, including alternative locations for a single 190-foot tower, co-location of Sprint PCS equipment on various existing towers, and systems that would use multiple (and shorter) towers to achieve the same level of coverage provided by a single 190-foot tower at the location proposed by plaintiffs. In response to a series of questions posed by the ZBA at the October 25 hearing, plaintiffs submitted the following responses relevant to the case now pending before this court:

3. *Why can't Sprint locate on the Kearsarge Tower? –* The distance from the Kearsarge tower to the intended service exceeds the transmission capability of a digital signal in the PCS frequency band. In addition, the State of New Hampshire has increased sensitivity due to the adverse publicity that the construction of this tower has generated. And finally, there is a continuing legal initiative directed at removing this tower. Perhaps Attorney Kidd has some knowledge of this issue.

. . .

7. *Request that the property owner allow the site to be located closer to I-89 or the opposite boundary from where it is? –* The property owners will not authorize the re-location as proposed.

. . .

12. *Provide specifics on alternative sites. –* Taken to the extreme, every other parcel of land could be an alternative site. In fact, we did not review any other sites because the site we have before you has minimal visual impact, allows us to use the sites to the South and North, and is distant from surrounding properties. Choosing an "alternate" site would only change the list of abutters, but would not change the expressed concerns or dialogue.

. . .

22. *Why can't smaller towers be used? -* If Sprint used smaller towers (shorter towers) of 80± feet, they would need five (5) towers to provide comparable coverage. This would not provide for co-location; therefore, all carriers seeking to enter the market or to augment their existing service would also need to construct towers. If all franchised service providers were to undertake this

initiative, the Sutton Land Use Boards will be reviewing tower applications on a continuing basis.  This is occurring in one municipality that has adopted an ordinance that limits height in relation to surrounding vegetation.

.  .  .

24.  *Provide information requested by RSA 240:12-J3IV a-d.* – See the attached.

.  .  .

d)  *Description of less-visually intrusive alternatives* – SBA Towers/ATC Realty LLC will utilize any stealth option as directed by the Sutton Land Use Board.  It has been my experience that this decision is within the duties of the Planning Board, Site Plan Review Criteria.

While this addresses part of the issue, obviously height is also a consideration.  As discussed in Item #22, if the shorter towers are utilized, more towers would be necessary.  Also, co-location would not be an option; therefore, this issue would be revisited by each carriers [sic], and the Town of Sutton would be continually addressing tower applications.  Generally, any tower application regardless of height or the application of stealth technology generates abutter concern.  Therefore, the controversy related to this application will be multiplied by five (5) times for Sprint PCS network.

In addition, shorter towers would only service transient traffic without offering service to any degree for Sutton's residents.  This scenario would be similar to Amherst where a "limited height – stealth" ordinance was adopted at town meeting subsequent to

submission of a resident petition.  This
ordinance, which was officially opposed by
the Planning Board and Board of Selectmen,
has subjected the town to numerous tower
applications <u>without</u> providing the town with
significant coverage.

In summary, visually less intrusive alternatives
were not proposed because:

- They do not work;

- They do not accommodate co-location;

- They are not really "less intrusive"; and

- They require many more towers.

(R. at 127-32.)


On December 6, 2000, the ZBA deliberated over whether
plaintiffs had met each of the five prerequisites for obtaining a
special exception.  (R. at 225-30.)  After its discussion, the
ZBA conducted a formal poll on the special exception question.
The results were as follows:

Criterion a [appropriateness of the site for the use].

- Kevin Carr voted no.  He said this is a
  residential area and a private road.  The
  residents are entitled to more protection.

- William Hallahan voted no.

- Andrew Supplee voted yes.

- Leslie Enroth voted yes.

Criterion b [detriment, etc., to the neighborhood].

- Leslie Enroth voted yes. She said the compound will be situated far back from residences.

- Kevin Carr voted no. He pointed out that not one person spoke in favor of this tower at the Public Hearings.

- Andrew Supplee voted yes.

- William Hallahan voted no.

Criterion c [hazard to traffic]

- It was the unanimous vote of the Board that the application does meet this criterion.

Criterion d [adequate and appropriate facilities]

- It was the unanimous vote of the Board that the application does meet this criterion.

Criterion e [consistency with the spirit of the SZO].

- Kevin Carr voted no. He referred to the Preamble of the Ordinance. He said there are alternatives to this 190-foot tower.

- Bill Hallahan voted no.

- Leslie Enroth voted yes, referring to previous approvals of special exceptions for commercial uses per the Ordinance.

- Andrew Supplee voted yes.

(R. at 231-32.)  By letter dated December 14, 2000, ZBA Chairman Andrew Supplee informed plaintiffs that the application was denied.  The substantive portion of the letter of decision stated, in full:

The reasons for the denial of your application are set forth in the minutes of the December 6, 2000 public deliberations of the ZBA, a copy of which are enclosed. However, a summary of those reasons is as follows:

1.  By a vote of 2-2, the ZBA found that you failed to carry your burden under Article VI, §A, 2(a) of the SZO, which requires an applicant for special exception to demonstrate that the proposed site is an appropriate location for the use or structure;

2.  By a vote of 2-2, the ZBA found that you failed to carry your burden under Article VI, §A, 2(b) of the SZO, which require an applicant for special exception to demonstrate that the proposed use will not be detrimental, injurious, noxious or offensive to the neighborhood; and

3.  By a vote of 2-2, the ZBA found that you failed to carry your burden under Article VI, §A, 2(e) of the SZO, which requires an applicant for special exception to demonstrate that the proposed use or structure is consistent with the spirit of the SZO.

(R. at 234.)

11

By letter dated December 22, 2000, plaintiffs moved for a rehearing. (R. at 235.) At its meeting on January 8, 2001, the ZBA unanimously denied plaintiffs' motion for rehearing. (R. at 246-47.) This action followed.

In Count I, plaintiffs assert that the ZBA's decision violates 47 U.S.C. § 332(c)(7)(B)(iii) because it was not supported by "substantial evidence contained in a written record."[1] In Count II, plaintiffs assert that the ZBA's decision violates 47 U.S.C. § 332(c)(7)(B)(i)(II) because it has the effect of "prohibiting the provision of personal wireless services" in Sutton. In Count III, plaintiffs assert a supplemental state-law claim that the ZBA's decision violates RSA 677:4 because it is "illegal or unreasonable." Furthermore, plaintiffs contend that the appropriate relief for those statutory violations is an injunction requiring the Town to grant the special exception previously denied by the ZBA.

_____

[1] Plaintiffs also assert that the ZBA erred by failing to decide whether their proposal met the four requirements of the SZO's wireless communications ordinance (i.e., minimized visual impact, location within the I-89 corridor, avoidance of five specific scenic locations, and use of existing towers, when feasible) before considering the five criteria for a special exception. However, for reasons made clear below, the court need not address that issue.

## Discussion

Both parties move for summary judgment on all three claims, which shall be considered in turn.

I.  47 U.S.C. § 332(c)(7)(B)(iii)

According to plaintiffs, the ZBA's decision that their application fails to meet three of the five criteria for a special exception is not supported by substantial evidence contained in a written record, as required by 47 U.S.C. § 332(c)(7)(B)(iii).  Plaintiffs examine each of the three criteria cited by the ZBA in denying the application, and, as to each criterion, discuss the evidence before the ZBA, explaining how, in their view, the evidence supports conclusions exactly opposite from those reached by the ZBA.  The Town counters by explaining how each of the ZBA's conclusions is supported by the evidence of record.  However, the parties' substantial evidence analysis is premature.

According to the relevant portion of the Telecommunications Act of 1996 ("TCA"), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place,

13

construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  In this circuit, the statute is understood to impose two requirements on a local land use board.  First, the board must issue a written decision, and second, the board's decision must be supported by substantial evidence in a written record.  Moreover, satisfaction of those two requirements should be considered sequentially.  See Southwestern Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 59 (1st Cir. 2001) ("Before examining the evidentiary support for the Board's decision, we must first determine whether the scope of our review is limited by the first requirement in section 332(c)(7)(B)(iii) that denials of permits be in writing.")  Finally,

> The "substantial evidence" standard of review [which, presumably, also applies to the writing requirement], is the same as that traditionally applicable to a review of an administrative agency's findings of fact. See Sprint Spectrum L.P. v. Town of North Stonington, 12 F. Supp. 2d 247, 252 (D. Conn. 1998).  Judicial review under this standard, "even at the summary judgment stage, is narrow."  Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

Southwestern Bell, 244 F.3d at 58.

14

As for what constitutes a legally sufficient written decision denying a request to construct a PWS facility,

> the TCA requires local boards to issue a written denial separate from the written record. That written denial must contain a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons.

Southwestern Bell, 244 F.3d at 60 (citing Sprint Spectrum, 12 F. Supp. 2d at 252). The rule stated above charts a course between two extremes: (1) requiring local land use boards to "issue formal findings of fact and conclusions of law," Southwestern Bell, 244 F.3d at 59 (citations omitted); and (2) allowing "the writing requirement [to be] satisfied by the written record of the meeting in which the application was denied and by the word "DENIED" and date of decision stamped upon a letter describing the application," id. Among other things, the latter approach "would frustrate meaningful judicial review." Id. at 60.

This court further notes that a written denial, containing explanations, serves the additional purpose of providing an unsuccessful applicant with information that will assist him or her in crafting an acceptable subsequent application.

15

Ordinarily, the education of applicants might not be a major concern, but where, as here, the statutory scheme requires, in two different provisions, "expeditious resolution," Town of Amherst, N.H. v. Omnipoint Communications Enters., Inc., 173 F.3d 9, 17 n.8 (1st Cir. 1999) (citing 47 U.S.C. § 332(c)(7)(B)(ii) & (v)), and does not allow state or local governments to "preclude wireless service altogether," Town of Amherst, 173 F.3d at 17 (citing 47 U.S.C. § 332(c)(7)(B)(i)(II)), the purposes of the TCA are best served by denials that fully inform applicants of the specific deficiencies in their applications. See Town of Amherst, 173 F.3d at 17 (a local regulatory body cannot "exhaust applicants by requiring successive applications without giving any clue of what will do the trick") (footnote omitted).

Here, the denial issued by the ZBA, even when viewed under the most deferential standard of review, does not make the grade. The December 14 letter of decision, quoted above, does nothing more than list three of the five criteria against which special exception applications are judged, and states in conclusory fashion that plaintiffs failed to carry their burden of demonstrating that: (1) "the proposed site is an appropriate

16

location for the use or structure," (R. at 234); (2) "the proposed use will not be detrimental, injurious, noxious or offensive to the neighborhood," (id.); and (3) "the proposed use or structure is consistent with the spirit of the SZO," (id.). While the letter of decision identifies the three special exception criteria that plaintiffs' proposal purportedly fails to meet, the letter does not explain how or why the proposed tower is: (1) inappropriate for the site; (2) detrimental, injurious, noxious or offensive to the neighborhood; and (3) inconsistent with the spirit of the SZO. Moreover, the decision does not give plaintiffs any guidance as to what sort of personal wireless facilities could be approved. Because the Town is not entitled to prohibit the provision of personal wireless services, see 47 U.S.C. § 332(c)(7)(B)(i)(II), such guidance should have been provided in the written decision.

The record of voting on the five prerequisites for issuance of a special exception, presented at pages 231 and 232 of the ZBA record, is hardly more informative than the letter of decision, and also fails to meet the standard set out in Southwestern Bell. Finally, given the requirement of "a written denial separate from

17

the written record," Southwestern Bell, 244 F.3d at 60, Chairman Supplee's statement, in the letter of decision, that "reasons for the denial . . . are set forth in the minutes of the December 6, 2000 public deliberations of the ZBA," (R. at 234), is plainly insufficient to meet the writing requirement of 47 U.S.C. § 332(c)(7)(B)(iii).

Because the ZBA failed to provide a written explanation of its decision sufficient to meet the statutory requirement, as construed by Southwestern Bell, the Town is in violation of the TCA, and plaintiffs are entitled to summary judgment on Count I.[2]

_____

[2] As for what would constitute adequate explanation of a permit denial, Southwestern Bell is instructive. In that case, the ZBA's written decision stated, in relevant part:

> It [the proposed tower] doesn't satisfy criteria of Minimum Visual Impact. Any tower that will be red and white with a beacon, that needs to be seen by a plan [sic] traveling over 100 mph, cannot have minimum visual impact, when there are no trees to hide it. Roads go 360 [degrees] around the site. The cirteria [sic] for granting a Special Permit cannot be satisfied. It would be an attractive nuisance being located next to schools. This does demonstrate that there is an adverse effect on property values.

244 F.3d at 56 (alterations in the original). According to the court of appeals, the decision quoted above is legally sufficient because while it "offers little explanation and few facts . . . the Board states the reasons for its decision with sufficient clarity to permit an assessment of the evidence in the record

Plaintiffs are not, however, entitled to the remedy they seek – an injunction ordering the Town to grant a special exception.  While the ZBA did not provide a legally sufficient written decision, there does not appear to be any reason why it could not do so.  Thus, the appropriate remedy is to vacate the ZBA's decision to deny plaintiffs' application, without ordering the ZBA to grant approval,[3] in order to afford the ZBA an opportunity to properly exercise its authority.

Such a result recognizes that "the local boards that administer the zoning laws are primarily staffed by laypeople,"

_____

supporting its reasons."  Id. at 60.

[3] Plaintiffs rely upon Brehmer v. Planning Bd. of Wellfleet, 238 F.3d 117 (1st Cir. 2001), for the proposition that the appropriate remedy for violation of the TCA is "injunctive relief in the form of an order requiring that the wrongfully withheld permit issue," id. at 120 (citing Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 497 (2d Cir. 1999)) (footnote omitted). Brehemer, however, is inapposite.  In that case, "the five members of the [Planning] Board unanimously concluded that [applicant] Omnipoint had satisfied all criteria of the town's zoning bylaws, [but] three members nonetheless voted against issuance of the permit," id. at 118, and explained that they had voted against the application on grounds that are explicitly prohibited by 47 U.S.C. § 332(c)(7)(B)(iv).  Here, by contrast, the record contains no indication that the ZBA unanimously concluded that plaintiffs' application satisfied all pertinent criteria, and there remains the possibility that plaintiffs' current application could be denied lawfully.

19

Southwestern Bell, 244 F.3d at 59, and also avoids awarding what could be considered a windfall – i.e., judicially ordered approval of an application that could have been properly denied by the local authority – based on a local board's simple failure to properly explain its denial (though the evidence before it was arguably sufficient to support the decision). In other words, the court cannot agree that a local board's failure to properly articulate its reasons for denying a permit application, as required by the TCA, automatically entitles an unsuccessful applicant to unconditional approval. On the facts of this case, all plaintiffs are due, at this point, is a legally adequate explanation of the ZBA's decision.

By vacating the ZBA's decision, without combing through the record to reach its own conclusion, the court is appropriately deferring to the ZBA as the decisionmaker, in the first instance, see Southwestern Bell, 244 F.3d at 59 (explaining that the standard of review under 47 U.S.C. § 332(c)(7)(B)(iii) is "highly deferential") (citing Penobscot Air Servs., Ltc. v. F.A.A., 164 F.3d 713, 718 n.2 (1st Cir. 1999)). And in any event, in the absence of a well-reasoned denial, the court is in no position to

address the substantial evidence question, see Southwest Bell, 244 F.3d at 60 ("written denial must contain a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons") (citation omitted), even if it were inclined to do so.

While limiting plaintiffs' relief to vacation of the ZBA's decision has the practical effect of remanding this case to the ZBA, the ZBA must understand that it cannot wage a war of attrition by issuing a series of faulty or inadequate decisions with the intent – or the apparent effect – of subjecting plaintiffs to an endless loop of denials and remands. See Town of Amherst, 173 F.3d at 17. At some point, sooner rather than later, plaintiffs must be granted approval for a tower or towers that will allow them to remedy the coverage gap in Sutton. See Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 70 (3d Cir. 1999) (citing Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999)) ("local zoning policies have the effect of prohibiting wireless communication

services [in violation of the TCA] if they result in 'significant gaps' in the availability of wireless services").

For the moment, remand and additional exploration by plaintiffs and the ZBA is the appropriate next step in resolving this dispute.  See Town of Amherst, 173 F.3d at 16-17.  The court well understands that plaintiffs may be dissatisfied with only a partial victory on their substantial evidence claim and the prospect of further administrative processes before the ZBA.  But some of the responsibility for the prolonged approval process rests with plaintiffs themselves, given their "one-proposal strategy," Town of Amherst, 173 F.3d at 15, which precluded the ZBA from considering the full range of possible and potentially effective PWS facilities in a single comprehensive process. Plaintiffs have some statutory clout behind their plans to erect cell towers, but they are hardly free to blight the landscape as they wish.

II.  47 U.S.C. § 332(c)(7)(B)(i)(II)

According to plaintiffs, the ZBA's decision to deny their application for a special exception effectively prohibits the

provision of personal wireless services in Sutton, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).  The Town counters by arguing that plaintiffs failed adequately to explore alternative sites and failed to present any alternatives to the ZBA.  The court agrees.

Under pertinent provisions of the TCA,

>    (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof –
>
>    . . .
>
>    (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

47 U.S.C. § 332(c)(7)(B).  For claims brought under 47 U.S.C. § 332(c)(7)(B)(i)(I) & (II) – unlike substantial evidence claims brought under subsection (B)(iii) – judicial review is de novo. See Southwestern Bell, 244 F.3d at 58 (citing Town of Amherst, 173 F.3d at 16 n.7).

The plain language of 47 U.S.C. § 332(c)(7)(B)(i)(II) dictates that local governments may not impose generalized

23

blanket bans on personal wireless services.  See Southwestern

Bell, 244 F.3d at 58 (citing AT&T Wireless PCS, Inc. v. City

Council of Virginia Beach, 155 F.3d 423, 428 (4th Cir. 1998)).

Furthermore,

> [i]f the criteria [for gaining approval of
> personal wireless facilities] or their administration
> effectively preclude towers no matter what the carrier
> does, they may amount to a ban "in effect" even though
> substantial evidence will almost certainly exist for
> the denial.  See Virginia Metronet, Inc. v. Board of
> Supervisors, 984 F. Supp. 966, 970 (E.D. Va. 1998).  In
> that event, the regulation is unlawful under the
> statute's "effect" provision.

Town of Amherst, 173 F.3d at 14.  To prevail on a claim of

effective prohibition, an unsuccessful applicant must demonstrate

"such fixed hostility by the [local land use] Board that one can

conclude that further applications would be useless."  Id.


Here, plaintiffs have not demonstrated that an effective

prohibition of personal wireless services exists in Sutton.  As

with wireless service provider Omnipoint in Town of Amherst,

plaintiffs in this case "did not present serious alternatives" to

the ZBA.  Town of Amherst, 173 F.3d at 15.  The record plainly

demonstrates that while the ZBA diligently asked about

24

alternative sites, plaintiffs maintained their inflexible position that a single 190-foot tower was the only solution, and declined to seriously consider the possibility of achieving the same result with several shorter towers.  Plaintiffs point out that they researched the possibility of locating a tower on state land near the rest area on I-89 and the possibility of co-location on the Mt. Kearsarge tower, but those two isolated inquiries do not constitute a comprehensive, good-faith response to the ZBA's legitimate request for information regarding a system of shorter towers.  See Southwestern Bell, 244 F.3d at 63 ("For a telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers.")

Moreover, plaintiffs' reliance on Town of Amherst and two subsequent district court cases is unavailing.  In Town of Amherst, the court of appeals stated: "Were Omnipoint's existing proposal the only feasible plan, then prohibiting its plan might amount to prohibiting personal wireless service."  173 F.3d at 14

(emphasis added); see National Tower, LLC v. Frey, 164 F. Supp. 2d 185, 188 (D. Mass. 2001) (characterizing the forgoing passage from Town of Amherst as dicta). As a preliminary matter, plaintiffs here have not demonstrated that their proposal is the only feasible one. They argue that the plan they have advanced ought to be more palatable to the Town than any other they could have proposed, but since they have not seriously explored other alternatives, there is simply no way of knowing. Given the Town's wide latitude in deciding questions related to the siting of telecommunication facilities, see Town of Amherst, 173 F.3d at 15 (citation omitted), and plaintiffs' failure to explore any alternative plans, it cannot be said that plaintiffs have proposed the only feasible siting plan. As for the district court cases cited by plaintiffs, both are materially distinguishable.

In Omnipoint Communications MB Ops., LLC v. Town of Lincoln, 107 F. Supp. 2d 108 (D. Mass 2000), a zoning By-Law limited PWS facilities to six discrete locations. Id. at 111. The owner of one of those sites refused to enter into a lease with Omnipoint, despite Omnipoint's best efforts to secure a lease. Id. at 118.

26

Because the combined effect of the town's By-Law and the property owner's refusal to lease was a service gap that Omnipoint had no way to fill, the district court found that personal wireless service had been effectively prohibited, within the meaning of 47 U.S.C. § 332(c)(7)(B)(i)(II). Here, by contrast, the SZO does not explicitly limit PWS facilities to a small number of discrete locations, and plaintiffs have not demonstrated that denial of their application leaves them without any means to fill the service gap that would be filled by their proposed tower.

In National Tower, LLC v. Frey, 164 F. Supp. 2d 185 (D. Mass. 2001), the Zoning Board of Town of Plainville denied a pair of permit applications. But, unlike the Sutton ZBA, which simply decided that the criteria for a special exception had not been met by the discrete application pending before it, the Plainville Zoning Board decided that it had no legal authority to approve any PWS facility that would fill the gap identified by the applicant. Id. at 188. Because the Sutton ZBA's reasons for denial are not, on their face, applicable to other potential applications for PWS facilities in the same zoning district as the Southfield Road property, plaintiffs have not demonstrated

27

that further applications would be futile.  In other words, the ZBA did not decide that no PWS facilities could be built, only that the particular facility proposed by plaintiffs did not qualify for a special exception.

While there may be merit to plaintiffs' contention that a single, taller tower satisfies the requirements for a special exception better than a number of shorter ones, that decision is not plaintiffs' to make.  "[S]ubject to an outer limit, such choices are just what Congress has reserved to the town."  Town of Amherst, 173 F.3d at 15 (citing AT&T Wireless, 155 F.3d at 428-29).  Because plaintiffs rejected, out of hand, any possibility of using multiple shorter towers, they have not shown "from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Town of Amherst, 173 F.3d at 14.  Nor have they "shown that the [ZBA] will inevitably reject an alternative . . . proposal with lower towers. " Id. at 16.  To the contrary, the record demonstrates that the ZBA was keenly interested in exploring such alternatives.

28

In sum, because plaintiffs have failed to show an effective prohibition of personal wireless services on the part of the ZBA, and have identified no trialworthy issue of material fact with respect to their prohibition claim, the Town is entitled to judgment as a matter of law on Count II. Of course, there may come a time when developing circumstances will constitute an effective prohibition within the meaning of 47 U.S.C. § 332(c)(7)(B)(i)(II). But, at present, the ZBA has certainly not effectively prohibited personal wireless services. The only "prohibition" so far has been plaintiffs' self-imposed prohibition against meaningful discussion of feasible alternatives to their current proposal.

III. RSA 677:4

In Count III, plaintiffs ask the court to set aside the ZBA's denial of their request for a special exception as illegal or unreasonable. Because the court has already vacated the ZBA's decision on other grounds, plaintiff's request for relief under state law is moot.

29

IV.  The Ultimate Resolution

"47 U.S.C. § 332(c)(7)[] is a deliberate compromise between two competing aims – to facilitate nationally the growth of wireless telephone service and maintain substantial local control over siting of towers."  Town of Amherst, 173 F.3d at 13 (footnote omitted).  Under the compromise set out in the TCA, developers of wireless networks are not entitled to locate facilities wherever they wish to, nor are local governments required to approve the "best" or most economical siting proposals, so long as permit denials are given in writing and are supported by substantial evidence in the record.  See id. at 14-15.  At the same time, however, local governments may not "preclude wireless service altogether. "  Id. at 17.  Congress has mandated that local authorities must permit developers to fill in wireless service gaps, see Cellular Tel. Co., 197 F.3d at 70, such as the one in Sutton – the existence of which the Town does not appear to contest.

Here, the ZBA failed to provide an adequate explanation for its denial of plaintiffs' application for a special exception, but plaintiffs contributed to the current impasse by deciding on

30

their own – rather than letting the ZBA decide – whether a single 190-foot tower is preferable to some number of shorter towers. The parties would be wise to consider the counsel offered by the court of appeals in Town of Amherst:

> Before any further litigation, [plaintiffs] might find it prudent to discuss with the [ZBA] an amicable resolution or an agreed upon procedure to achieve one. The [ZBA] must also face reality. If [it's] position is that it can just sit back and deny all applications, that position in the end could, if maintained, prove fatal to the [Town] rather than [plaintiffs]. Under federal law, the town can control the siting of facilities but . . . it cannot preclude wireless service altogether. Nor, in the face of a vigilant district court, can the town exhaust applicants by requiring successive applications without giving any clue of what will do the trick. Thus, it is in the common interest of the [Town] and [plaintiffs] to find ways to permit the siting of towers in a way most congenial to local zoning.

Town of Amherst, 173 F.3d at 17 (footnote omitted).

## Conclusion

For the reasons given: (1) plaintiffs' motion for summary judgment (document no. 8) is granted, and the Town's motion (document no. 7) is denied, as to Count I; (2) the Town's motion for summary judgment is granted, and plaintiffs' motion is denied, as to Count II; and (3) Count III is moot. Plaintiffs'

31

relief, however, is limited to vacation of the ZBA's special exception denial. The Clerk of Court shall enter judgment vacating the ZBA's denial of plaintiffs' application for a special exception in accordance with this order, and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 7, 2002

cc:  Alexander J. Walker, Esq.
     Timothy Bates, Esq.